**In re SANDERS, Debtors.**

**Ford Motor Credit, Appellant,**

v.

**Sandy Eugene Sanders, et al., Appellees.**

**Bankruptcy No. 07–50783–LMC.**
**Civil Action No. SA–07–CV–1013–XR.**

United States District Court,
W.D. Texas,
San Antonio Division.

March 30, 2009.

436

Paul W. Rosenbaum, San Antonio, TX, for debtors.

Marion A. Olson, San Antonio, TX, trustee.

## MEMORANDUM OPINION AND ORDER

XAVIER RODRIGUEZ, District Judge.

Before the Court is Ford Motor Credit's ("FMC" or "Appellant") appeal from the Bankruptcy Court's order denying FMC's objection to confirmation of the Debtors' Amended Chapter 13 Plan. The primary issue in this appeal is whether the Bankruptcy Court erred in concluding that FMC's financing of the Debtors' "negative equity" in their trade-in vehicle rendered the "hanging paragraph" codified at 11 U.S.C. § 1325(a) inapplicable to FMC's secured claim in the Debtors' vehicle, such that the claim could be bifurcated under § 506(a). Concluding that the Bankruptcy Court so erred, we reverse and remand to

the Bankruptcy Court for proceedings consistent with this opinion.

## Background and Procedural History

On December 4, 2004, Sandy Eugene Sanders and Bonnie Jean Chymeryc-Sanders (collectively, "Debtors" or "Appellees") purchased from a dealership for their personal use a new 2005 Ford Explorer. The Debtors agreed to pay $26,523.05 for the Explorer, plus tax, title, license, and fees. The dealer agreed to finance those charges through a simple interest motor vehicle retail installment contract.

The Debtors additionally agreed with the dealer to trade in the Debtors' existing vehicle, a 1999 Chevrolet Tahoe. The parties agreed upon a trade-in value of $8,000 for the Tahoe. At the time of the transaction, however, the Debtors owed $10,324.13 on a secured loan they took out to purchase the Tahoe. Thus, after accounting for the negotiated trade-in value of the Tahoe, the Debtors still owed $2,324.13 on the loan they originally took out to pay for the Tahoe. This amount is referred to as "negative equity." In order to discharge that security interest and to take clear title to the Tahoe, the dealer needed to pay off in full the original loan securing the Tahoe.[1] To make up for the shortfall in value, the Debtors agreed to pay to the dealer $2,324.13, representing the Debtors' remaining liability under the loan originally securing the Tahoe. The parties financed this charge under the same installment contract related to the new Explorer. Thus, the parties agreed that the Debtors would acquire the new Explorer, that the Debtors would trade-in the Tahoe, and that the Debtors would agree to pay the dealer future payments totaling $28,289.72, representing the price of the new Explorer, taxes, fees, and other charges related to the Explorer, and the negative equity related to the Tahoe, less a $2,500 dealer rebate.[2] The dealer subsequently assigned the contract to FMC.

The Debtors filed a Chapter 13 bankruptcy petition on March 30, 2007. FMC filed a proof of claim in the amount of $19,731.28, representing the remaining amount the Debtors owed under the installment contract. The Debtors' Amended Chapter 13 Plan proposed to bifurcate Ford Motor Credit's claim pursuant to 11 U.S.C. § 506(a), treating it as a secured claim only to the extent of the value of the Explorer and an unsecured claim for the balance. Section 506(a) generally permits this practice and provides in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

11 U.S.C. § 506(a). Thus, the Plan proposed that FMC would have a secured claim of only $16,225.00 (the alleged value of the Explorer on the petition date) which would accrue interest at the rate of 10%

---

1. *See* TEX. PEN.CODE § 32.34 (criminalizing acceptance of a trade-in vehicle secured by a prior lien without discharging the prior lien or obtaining the consent from the vehicle's secured creditor).

2. The installment contract provided for .90% interest and was payable over 35 months in monthly payments of $361.61 with a final balloon payment of $15,457.50. The contract gave the Debtors three options with respect to the balloon payment: (i) make the payment and acquire ownership of the Vehicle free of the lien, (ii) refinance the balloon payment, or (iii) sell the Vehicle to the dealer for the amount of the payment, less a $250 disposal fee.

per annum and would be paid over 60 months for a total payment of $23,641.12. The balance of FMC's claim, $3,506.28, would be treated as unsecured indebtedness and would be paid pro-rata with other unsecured, non-priority claims.

FMC objected to the Debtors' Amended Chapter 13 Plan, asserting that its claim was protected from bifurcation by virtue of a paragraph added to section 1325(a) of the Bankruptcy Code under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). This new paragraph is unnumbered and is therefore commonly referred to as the "hanging paragraph." The hanging paragraph states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, . . . .

11 U.S.C. § 1325(a)(*).[3]

The Bankruptcy Court overruled FMC's objection and confirmed the Plan. The Bankruptcy Court held that FMC's claim was not protected from bifurcation due to the claim's inclusion of charges for negative equity. Specifically, the Bankruptcy Court ruled that FMC did not have a purchase money security interest ("PMSI") in the amount financed for the negative equity related to the Debtors' trade-in vehicle. Further, since FMC's security interest was not a PMSI to the full extent of its claim, the Bankruptcy Court held that FMC's entire claim was not pro-tected by the hanging paragraph. FMC appeals, seeking reversal of this ruling.

## Statement of Jurisdiction

The Court has jurisdiction over this matter because it is an appeal from a final order of the Bankruptcy Court. *See* 28 U.S.C. § 158; *In re Dale*, No. H–07–3176, 2008 WL 4287058, at *1 (S.D.Tex. Aug. 14, 2008), *appeal docketed*, No. 08–20583 (5th Cir. Sept. 15, 2008).

## Standard of Review

A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. *In re Morrison*, 555 F.3d 473, 479 (5th Cir.2009). According to the parties, there are no disputed factual issues, and this appeal presents only questions of law.

## Analysis

The issue presented in this appeal is whether the hanging paragraph of 11 U.S.C. § 1325(a) exempts FMC's claim from the bifurcation provision of section 506. "The appropriate starting point when interpreting any statute is its plain meaning." *United States v. Elrawy*, 448 F.3d 309, 315 (5th Cir.2006) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). The text of the hanging paragraph states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase-money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [*sic* ] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49)

---

**3.** Because the hanging paragraph was not provided its own subsection, the developing convention for citing the hanging paragraph appears to be by way of the asterisk.

acquired for the personal use of the debtor; . . . .

11 U.S.C. § 1325(a)(*). Bifurcation is thus prohibited where: "(1) the creditor has a purchase money security interest which secures the debt; (2) the debt was incurred within 910 days of the date the petition was filed; (3) the collateral securing the debt is a motor vehicle; and (4) the motor vehicle was acquired for the personal use of the debtor." *In re Busby*, 393 B.R. 443, 448 & n. 7 (Bankr.S.D.Miss. 2008); *see also In re Dunlap*, 383 B.R. 113, 114 (Bankr.E.D.Wis.2008). In this appeal, the parties do not dispute that the latter three elements are satisfied. Moreover, the parties do not dispute—and the Bankruptcy Court conceded [4]—that FMC's security interest in the new vehicle is a purchase-money security interest to the extent that it secures the sticker price of the vehicle as well as finance charges and charges for taxes, title, license, and registration fees. The Court thus must decide whether (and to what extent) the additional charge for negative equity, also secured by the new vehicle, renders the hanging paragraph inapplicable to FMC's claim.

▆ The bulk of the parties' briefing addresses whether the portion of the debt which represents the financing for negative equity secured by the new vehicle qualifies as a purchase-money security interest in that vehicle.[5] Under the facts of this case and the plain meaning of the

hanging paragraph, however, the hanging paragraph operates to exempt FMC's entire claim from bifurcation regardless of the nature of the charge for negative equity. The Court agrees with Appellant's first argument that the plain meaning of the hanging paragraph does not require the *entire* portion of the debt that is the subject of its claim to be secured by a purchase-money security interest. The hanging paragraph applies merely "if the creditor has a purchase-money security interest securing the debt that is the subject of the claim." 11 U.S.C. § 1325(a)(*). The terms of the statute do not limit its application "to the extent" that the creditor has a purchase-money security interest or to the "portion" of the debt secured by a purchase-money security interest. *Cf., id.* § 506(a) (allowing for bifurcation of claims "to the extent of" the value of the underlying collateral securing the claim); *id.* § 522(f) (permitting avoidance of a non-purchase money security interest in certain consumer goods "to the extent" that the lien resulting from the security interest impairs a debtor's ability to claim an exception). Rather, the plain statutory language is broad and unqualified, applying to situations where, as here, the creditor has *a* purchase-money security interest which secures the debt.

Indeed, the Southern District of Texas recently resolved a nearly identical dispute on similar grounds:

---

**4.** *See In re Sanders*, 377 B.R. 836, 859 (Bankr. W.D.Tex.2007) ("We know on the facts of this case that FMC has a purchase money security interest that secures part of the debt.").

**5.** Indeed, the great majority of courts that have examined similar claims have proceeded to analyze whether charges for negative equity constitute a "purchase-money security interest" as that term is used in the hanging paragraph. *See, e.g., In re Graupner*, 537 F.3d 1295 (11th Cir.2008) (concluding that charge for negative equity constituted purchase-mon-

ey security interest and therefore hanging paragraph applied to creditor's claim); *In re Muldrew*, 396 B.R. 915 (E.D.Mich.2008) (same); *GMAC v. Horne*, 390 B.R. 191 (E.D.Va.2008) (same); *In re Penrod*, 392 B.R. 835 (9th Cir. BAP 2008) (concluding that charge for negative equity did not constitute purchase-money security interest); *In re Callicott*, 396 B.R. 506 (E.D.Mo.2008) (same); *In re Busby*, 393 B.R. 443 (Bankr.S.D.Miss.2008) (same). *See also Graupner*, 537 F.3d at 1300 (collecting cases).

Neither Dale [the debtor] nor Ford Credit [the creditor] contest that *a portion* of the indebtedness is a purchase money obligation secured by the Motor Vehicle. Thus, because Ford Credit 'has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor,' 11 U.S.C. § 1325(a), '[f]or purposes of paragraph (5), section 506 shall not apply to' Ford Credit's claim. *Id.* Because absent § 506's bifurcation mechanism no cramdown is available under federal law, *the entire claim, not just the purchase money portion, is secured.*

*In re Dale*, 2008 WL 4287058, at *4 n. 12 (emphasis added). We agree with the reasoning of the Southern District of Texas and conclude that the plain meaning of the hanging paragraph applies to exempt FMC's entire claim from bifurcation under section 506(a).

■ Nevertheless, even if the hanging paragraph applies only to the extent that the debt is secured by a purchase-money security interest, the Bankruptcy Court order must be reversed because FMC's charge for negative equity created a purchase-money obligation in the new vehicle.[6] To reach this conclusion, we must first define "purchase-money security interest" as that term is used in the hanging paragraph. The bankruptcy code does not define the term. The parties contend that its definition is an issue of state law, and the large majority of courts that have examined the issue agree.[7]

We thus turn to the UCC as codified in Texas, which provides the following definitions:

> "A security interest in goods is a **purchase-money security interest** to the extent that the goods are purchase-money collateral with respect to that security interest." TEX. BUS. & COM.CODE § 9.103(b).

> " '**Purchase-money collateral**' means goods ... that secure[ ] a purchase-money obligation incurred with respect to that collateral." *Id.* § 9.103(a).

---

**6.** As has been well-documented, there is a large split among the many decisions that have examined this issue. *See Graupner*, 537 F.3d at 1300 (collecting cases). The sole circuit court, some of the district courts, and many of the bankruptcy courts that have examined this issue concluded that the creditor's purchase-money security interest includes financing for negative equity. *See, e.g., Graupner*, 537 F.3d 1295 (11th Cir.2008); *In re Muldrew*, 396 B.R. 915 (E.D.Mich.2008); *GMAC v. Horne*, 390 B.R. 191 (E.D.Va.2008); *General Motors Acceptance Corporation v. Peaslee*, 373 B.R. 252 (W.D.N.Y.2007), *appeal docketed*, No. 07–3962–bk (2d Cir. Sept. 14, 2007). The Ninth Circuit Bankruptcy Appellate Panel, some of the district courts, and many bankruptcy courts to have examined the issue concluded that financing for negative equity does not qualify as a purchase-money security interest. *See, e.g., In re Penrod*, 392 B.R. 835 (9th Cir. BAP 2008); *In re Callicott*,

396 B.R. 506 (E.D.Mo.2008) (same); *Bank of America v. Look*, Civil No. 08–129–P–H, 2008 WL 2789477 (D.Me. July 17, 2008).

**7.** *See, e.g., Graupner*, 537 F.3d at 1301 ("[W]e agree with the bankruptcy court that, when looking at Georgia state law, negative equity is more properly regarded as [purchase money]."); *Horne*, 390 B.R. at 198; *Busby*, 393 B.R. at 449. *See also Travelers Cas. & Sur. Co. of Amer. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450–51, 127 S.Ct. 1199, 167 L.Ed.2d 178 ("[W]e have long recognized the that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' ") (*quoting Butner v. United States*, 440 U.S. 48, 54, 57, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

" 'Purchase-money obligation' means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."
*Id.*

Our task under the UCC is thus to determine whether the debtors incurred the charge for negative equity as "all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral."

To aid in our interpretation, Comment 3 to § 9.103 provides:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

*Id.* cmt. 3.

The Bankruptcy Court concluded that the "price" did not include the charge for the Debtors' negative equity in the trade-in vehicle. Rather than examining whether the charge for negative equity came within the scope of Comment 3, however, the Bankruptcy Court ultimately based its interpretation of the word "price" on the "rules of common sense" and the context of the phrase "price of collateral" as used in section 9.103(a).[8] Resort need not be made, however, to what the Bankruptcy Court terms the "rules of common sense" or the structure of section 9.103, however, because the language of section 9.103 and Comment 3 confirms that "price" as used in section 9.103 encompasses charges for negative equity. "Price" includes "obligations for expenses incurred in connection with acquiring rights in the collateral." Here, the Debtors, as part of the value given to acquire the collateral (the new vehicle), gave to the dealer title to their existing vehicle. In order to accept the trade-in as part of the value given to acquire the new vehicle, the dealer incurred the expense of paying off the existing loan on the trade-in vehicle, as it was required to do under Texas law.[9] The Debtors, in turn, incurred an obligation to repay to FMC the balance of that expense (the negative equity). The negative equity that was financed thus constituted an "obligation[ ] for [an] expense[ ] incurred in connection with acquiring rights in the collateral." Thus, "price" as that term is used to define "purchase-money obligation" in § 9.103, includes the charge for the Debtors' negative equity in the trade-in vehicle.[10]

Comment 3 further requires that "a close nexus [exist] between the acquisition of collateral and the secured obligation."

---

**8.** *Id.* at 852–54.

**9.** *See* Tex. Pen.Code § 32.34 (criminalizing acceptance of a trade-in vehicle without discharging the prior lien or obtaining the consent from the vehicle's secured creditor).

**10.** Because "price" and "value given to enable" are defined identically in Comment 3, we reach the same conclusion with respect to "value given to enable."

442

The Eleventh Circuit in *Graupner* concluded:

> We believe there is such a "close nexus" between the negative equity in the Debtor's trade-in vehicle and the purchase of his new vehicle. The financing was part of the same transaction and may be properly regarded as a "package deal." Payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction, and utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle. As the district court held in affirming the bankruptcy court, the negative equity was an "integral part of," and "inextricably intertwined with," the sales transaction. To hold otherwise would not be a fair reading of the UCC.

*In re Graupner*, 537 F.3d at 1302; *see also GMAC v. Horne*, 390 B.R. at 205. The Court concurs with the view of the Eleventh Circuit and concludes that the nexus requirement was satisfied in this case because the negative equity financing was inextricably intertwined with the transaction between the parties.

Even though the Bankruptcy Court failed to look to the language of section 9.103 and Comment 3 to analyze whether "price" as used in section 9.103 encompasses the negative-equity charge, the Bankruptcy Court looked to another statute, the Texas Motor Vehicle Installment Sales Act ("MVISA")[11], to confirm its conclusion.[12] MVISA, among other things, governs certain sales and financing practices related to the sale of motor vehicles, including retail installment transactions such as the transaction that is the subject of FMC's

claim. In relevant part, MVISA authorizes the parties to a retail installment contract—as was done in this case—to include in the computation of the principal balance under a retail installment contract the cash price of the vehicle (which includes the price of accessories, the price of services related to the sale, the price of service contracts, taxes, and fees for license, title, and registration), certain itemized charges, and amounts advanced to "retire an amount owed against a motor vehicle used as a trade-in." TEX. FIN.CODE §§ 348.004–348.006, 348.404(b). The Bankruptcy Court stated that MVISA confirms its position because MVISA defines "cash price" of a vehicle as merely including the sticker price, the price of accessories, the price of services related to the sale, the price of service contracts, taxes, and fees for license, title, and registration. *See* TEX. FIN. CODE § 348.004. Thus, the Bankruptcy Court reasoned, MVISA's exclusion of charges for negative equity from the "cash price" of the vehicle confirms that "price" as used in the Texas UCC does not include charges for negative equity.

The Court respectfully disagrees with this analysis. The Bankruptcy Court ignores the definition of "price" that the UCC itself provides to define "purchase-money obligation," but nevertheless comments that the MVISA's definition of "cash price," a term not used to define "purchase money obligation," supports its analysis. As discussed above, the UCC provides a broad and expansive definition of "price" that includes charges beyond those enumerated in MVISA's definition of "cash price." Thus, it is immaterial that "cash price"—a term not used in section 9.103 to

---

11. TEX. FIN.CODE §§ 348.001, *et seq.*

12. Even though the Bankruptcy Court concluded that the UCC and MVISA ought not be read *in pari materia*, the Bankruptcy Court nevertheless used its interpretation of MVISA

to conclude that it "supports the conclusion that 'price of the collateral' in all likelihood does *not* include monies advanced to pay off negative equity." 377 B.R. at 849.

define "purchase money obligation"—is defined more narrowly than the "price" as defined by the Texas UCC.

■ If anything, the MVISA supports the Court's conclusion that FMC's purchase-money security interest encompasses the charge for negative equity.[13] MVISA authorizes the parties to a retail installment contract to include in the computation of the principal balance of the contract the cash price of the vehicle, certain itemized charges, and amounts advanced to "retire an amount owed against a motor vehicle used as a trade-in" and to finance that amount. TEX. FIN.CODE §§ 348.004–348.006, 348.404(b). The fact that MVISA authorizes parties to treat charges for negative equity as the principal of a loan provided to enable a party to acquire a new vehicle bolsters the view that the negative equity financing was inextricably intertwined with the sales transaction and supports the conclusion that a close nexus exists between the corresponding secured obligation and the acquisition of the new vehicle. *See* TEX. BUS. & COM.CODE § 9–103 cmt. 3.

Finally, although the Bankruptcy Court failed to address adequately Comment 3 in its analysis of whether "price" encompasses negative equity, the Bankruptcy Court briefly discussed whether Comment 3 permits the conclusion that "value given to enable" includes negative equity financing:

But what, then, does "value given to enable" mean? Comment 3 to section 9.103 offers some guidance. The comment, in pertinent part, reads:

As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

TEX. BUS. & COMM.CODE, § 9.103, Comment 3. In listing the types of obligations that might be includable, the comment seemingly equates "price" with "value given to enable." The drafters of the Uniform Commercial Code, in other words, saw these two expressions as describing essentially the same concept, though from different viewpoints, with "price" being from the point of view of the buyer and "value given to enable" being from the point of view of the financer.

The principle of *ejusdem generis*, applied to the listing in the comment, also cuts against inclusion of the payoff of negative equity on the trade-in vehicle. The items listed are closely connected with the purchase of the vehicle itself—compensating the seller for the cost of delivering the vehicle, repaying the seller for sales taxes realized from the sale of the vehicle, paying for such related administrative charges as title costs and

---

**13.** The Court agrees with FMC that the statutes ought to be read *in pari materia*. Under Texas law, "[s]tatutes are *in pari materia* if they concern the same subject, relate to the same person or class of persons, or have the same object or purpose. Statutes found to be in pari materia are construed together, and, if possible, conflicts between the statutes are harmonized." *In re J.M.R.*, 149 S.W.3d 289, 292 (Tex.App.-Austin 2004, no pet.) (internal citation omitted). Although the MVISA does not address security interests, each statute sets forth rules that govern the incursion of obligations to finance expenses related to the acquisition of a motor vehicle. Further, each statute relates to and establishes the rights between the same classes of persons, namely, debtors and creditors. Given these similarities, the statutes should be construed together and to avoid conflicts between the statutes.

license fees associated with transferring ownership of the vehicle from seller to buyer, and the like. In addition, the list includes costs normally associated with the enforcement of the security interest once granted—attorneys' fees, collection and enforcement costs, and the like. FMC would have the court read into the generic first item "obligations for expenses incurred in connection with acquiring rights in the collateral" an item—that is, the payoff of negative equity—wholly out of keeping with the nature of the other specific items listed. That violates the *ejusdem generis* rule of statutory construction, a rule appropriately employed when reading comments to uniform enactments. *See, e.g., Weisbart & Co. v. First Nat'l Bank of Dalhart, Tex.,* 568 F.2d 391, 395 (5th Cir.1978) (applying the doctrine to "sale, exchange, or other disposition," found in section 9.306 of the UCC as enacted at that time).

*In re Sanders,* 377 B.R. at 854–55. Thus, rather than considering whether the negative equity financing was actually an obligation for an expense incurred in connection with acquiring rights in the collateral, the Bankruptcy Court looked to the other items specifically listed in Comment 3, concluded that negative equity financing is not similar enough in "nature [with] the other specific items listed," and concluded that negative equity financing does not come within Comment 3's reach.

This appears to be a product of the Bankruptcy Court's erroneous conclusion that the specific items listed in Comment 3 amounts to a list of "obligations for expenses incurred in connection with acquiring rights in the collateral." *See id.* at 848 ("Even the Official Comment to section 9.103 acknowledges that 'price' is not in fact simply the 'actual price' of the collateral itself, *offering a listing of 'obligations for expenses incurred in connection with*

*acquiring rights in the collateral.'* ") (emphasis added). The Bankruptcy Court apparently infers from the structure of Comment 3 that the more specifically described items within Comment 3, such as sales taxes, duties, finance charges, and interest, are meant to be a list of examples defining "obligations for expenses incurred in connection with acquiring rights in the collateral." However, the language of Comment 3 prohibits this conclusion. The Comment does not include language (such as "obligations for expenses incurred in connection with acquiring rights in the collateral, *including* sales taxes, duties, . . .") that would suggest that the more specific categories were intended to be mere examples of such obligations. Rather, the language of the Comment clearly states that it is the " 'price' of collateral or the 'value given to enable' [that] *includes*" each of the listed categories. The structure and language of Comment 3 thus indicates that Comment 3 offers a non-exclusive listing of categories of items—independent from one another—that qualify as the "price of the collateral" and "value given to enable." One such category includes "obligations for expenses incurred in connection with acquiring rights in the collateral." The Bankruptcy Court's interpretation, however, ignores that "obligations for expenses incurred in connection with acquiring rights in the collateral" is a category independent of the other listed items and deserving of its own analysis, an analysis that the Court conducts in this opinion. Any proper analysis thus must examine whether negative equity financing fits within the category, regardless of whether such charges are similar in nature to the other specifically listed items. And as discussed above, the negative equity charge in this case was such an obligation.

The Court thus concludes that the hanging paragraph applies to FMC's claim re-

gardless of whether the charge for negative equity constitutes a purchase-money obligation. Nevertheless, the FMC's purchase-money security interest encompasses the amount financed for the Debtors' negative equity in the trade-in vehicle. Under either analysis, the hanging paragraph applies to the entirety of FMC's claim.

## Conclusion

For the foregoing reasons, the order of the Bankruptcy Court is REVERSED. This action is REMANDED to the Bankruptcy Court for further proceedings consistent with this opinion.

It is so ORDERED.