**In re Timothy John PADGETT and Tracie Arlene Padgett, Debtors.**

**AmeriCredit Financial Services, Inc., Appellant,**

**v.**

**Timothy John Padgett and Tracie Arlene Padgett, Appellees.**

BAP No. KS–08–069.

Bankr.No. 07–41284.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

July 20, 2009.

---

64. *Id.*

65. *Id.*

Marilyn J. Washburn of RiezmanBerger, P.C., St. Louis, MO, for Appellant.

Joseph I. Wittman, Topeka, KS, for Appellees.

Patricia E. Hamilton of Henson, Hutton, Mudrick & Gragson, LLP, Topeka, KS, filed an amicus brief for the Kansas Bankers Association in support of Appellant.

Before MICHAEL, BROWN, and STARZYNSKI[1], Bankruptcy Judges.

## OPINION

MICHAEL, Bankruptcy Judge.

Creditor AmeriCredit Financial Services, Inc. ("AmeriCredit") appeals the

---

1. Honorable James S. Starzynski, United States Bankruptcy Judge, United States Bankruptcy Court for the District of New Mexico, sitting by designation.

bankruptcy court's order confirming the Chapter 13 plan of Timothy John Padgett and Tracie Arlene Padgett ("Debtors"). AmeriCredit asserts that the bankruptcy court erred when it allowed Debtors to bifurcate and cram down its 910 vehicle claim under 11 U.S.C. §§ 506 & 1325(a)(5), notwithstanding the addition of the "hanging paragraph" to § 1325(a) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). We agree with AmeriCredit, and reverse the bankruptcy court's confirmation order.

## I. BACKGROUND

In this case, the parties filed a joint stipulation of facts ("Joint Stipulation") which the bankruptcy court adopted.[2] The following facts are taken from the bankruptcy court's published opinion.[3]

On March 22, 2007, Debtors purchased a 2006 Toyota Corolla (the "Corolla"), in part by trading in a 2000 Ford Windstar (the "Windstar") on which Debtors still owed a significant amount. In connection with this purchase, Debtors entered into a financing agreement and signed a promissory note that is currently held by AmeriCredit. The contract indicates the price of the Corolla was $16,288, and that Debtors made a $6,000 down payment, resulting in an unpaid balance of $10,288. Under the contract, lender was required to pay, on Debtors' behalf, a filing fee of $4, gap insurance in the amount of $600, and a net payoff of $11,350 owed on the Windstar ("negative equity").[4] Therefore, the total amount financed in the transaction was $22,242. Debtors agreed to pay this amount, together with 18.75% interest, over 72 months, at $516 per month.

Six months after purchasing the Corolla, Debtors filed their Chapter 13 bankruptcy petition and proposed plan (the "Plan") on September 19, 2007. Although the Plan valued the Corolla at $13,500 as of the date of filing, it proposed to pay AmeriCredit $14,615, plus interest, on its "910 car loan."[5] AmeriCredit filed a proof of claim for a secured claim in the amount of $22,470,[6] to which Debtors objected.

Debtors argued to the bankruptcy court that the amount they must pay AmeriCredit as a secured claim through the Plan excludes the negative equity. They contended that the negative equity is not a purchase money obligation, and could thus be "crammed down." AmeriCredit asserted that the entire amount financed, including the negative equity, constitutes a purchase money obligation and must be paid in full pursuant to the so-called "hanging paragraph" of 11 U.S.C. § 1325(a).[7] The

---

**2.** *Joint Stipulation of Facts, in* Appellant's App. at A65–67.

**3.** *In re Padgett,* 389 B.R. 203 (Bankr.D.Kan. 2008).

**4.** The debt on the traded-in Windstar was $14,100. The dealer agreed to pay $2,750 for the trade-in, leaving a balance due to the Windstar's lender of $11,350. This is the amount financed and paid off by the new lender under the contract, which the Court will refer to hereafter as "negative equity."

**5.** A "910 car loan" is a purchase money loan made for a vehicle that is for the personal use of the debtor within 910 days of the filing of a bankruptcy petition. *See* 11 U.S.C.

§ 1325(a)(*). There is no dispute that the debt was incurred within 910 days of the filing of the petition, that the collateral is a covered motor vehicle, and that it was acquired by Debtors for their personal use.

**6.** *Joint Stipulation, in* Appellant's App. at A65.

**7.** *See Graupner v. Nuvell Credit Corp. (In re Graupner),* 537 F.3d 1295, 1296 n. 1 (11th Cir.2008) for an explanation of the terminology "hanging paragraph." Unless otherwise indicated, all future statutory references in text are to the Bankruptcy Code, Title 11 of the United States Code.

parties' Joint Stipulation does not specifically state whether the sale of the Corolla would not or could not have been consummated unless the seller not only took Debtors' Windstar in trade, but also paid off the negative equity.

The bankruptcy court agreed with Debtors' position and confirmed their Plan on alternative grounds: 1) the negative equity was not a purchase money obligation and therefore not subject to the anti-bifurcation provisions of the hanging paragraph; and 2) even if the negative equity was a purchase money obligation, AmeriCredit failed to meet its burden of demonstrating that financing the negative equity enabled the Debtors to purchase the vehicle.[8] AmeriCredit timely appeals the bankruptcy court's confirmation order.

## II. APPELLATE JURISDICTION

■ This Court has jurisdiction to hear timely-filed appeals from final judgments and orders of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[9] A decision is considered final "if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'"[10] Here, the bankruptcy court's order confirming the Debtors' Chapter 13 plan is a final decision for purposes of review.[11] Neither party elected to have this appeal heard by the United States District Court for the District of Kansas. The parties have thus consented to appellate review by this Court.

## III. ISSUE ON APPEAL AND STANDARD OF REVIEW

■ The issue raised by AmeriCredit on appeal is whether the bankruptcy court properly construed the applicable state law definition of purchase money security interest to exclude negative equity. A question of law is presented because the case was submitted on stipulated facts. The bankruptcy court's legal conclusions are reviewed *de novo*,[12] as are its determinations of state law.[13] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[14]

8. Specifically, the bankruptcy court stated:

   The Court ... finds that the negative equity payoff obligation is not necessary to the transaction, is not of the same type or magnitude as the other items listed in Official Comment 3, and there is an insufficiently close nexus between retiring the antecedent debt on the trade-in vehicle and acquiring a new vehicle to constitute purchase money. As an alternative basis, the Court finds that AmeriCredit did not meet its burden of demonstrating, under the stipulated facts of this case, that the negative equity financing "enabled" Debtors to purchase this vehicle. That proof was not forthcoming because the parties' stipulation of facts is entirely silent on that issue. Accordingly, even if the Court is incorrect in finding that the negative equity financing is not part of the price or did not "enable" Debtors to acquire the vehicle, the fact that AmeriCredit did not carry its burden of proof on these particular facts is enough to conclude that the nega-

   tive equity was not part of the PMSI transaction in this case.

   *Padgett*, 389 B.R. at 212 (footnotes omitted).

9. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002.

10. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

11. *Interwest Bus. Equip. Inc. v. United States Trustee (In re Interwest Bus. Equip., Inc.)* 23 F.3d 311, 315 (10th Cir.1994).

12. *In re Osborn*, 24 F.3d 1199, 1203 (10th Cir.1994).

13. *Id.* at n. 5.

14. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

## IV. DISCUSSION

█ Since enactment of BAPCPA in 2005, a multitude of bankruptcy and district courts throughout the country have wrestled with the issue before us on appeal, and have reached divergent and incompatible conclusions.[15] Additionally, two United States Circuit Courts of Appeal have now had an opportunity to tackle the question presented: the Eleventh Circuit in *In re Graupner ("Graupner")*,[16] and the Fourth Circuit in *In re Price ("Price")*.[17] Both the *Graupner* court, interpreting Georgia law, and the *Price* court, interpreting North Carolina law, concluded that negative equity financed in connection with a 910 vehicle loan constitutes a purchase money obligation. The *Graupner* and *Price* courts held that, pursuant to the hanging paragraph of § 1325(a), debtors are precluded from bifurcating the debt into secured and unsecured portions and cramming it down through a plan. Critical to both circuit courts' decisions are their determinations that negative equity financing is an integral part of a debtor's purchase of a new car, and that such result effectuates Congressional intent.[18] Though we are not bound by these decisions, we find the analysis of the *Graupner* and *Price* courts persuasive, and see nothing in Kansas law that compels a different result.[19]

### A. Applicable Authorities

Section 506(a)(1), which gives rise to bifurcation of claims, provides in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property[.][20]

Prior to BAPCPA, this provision, together with § 1325(a)(5)(B) allowed "cram down" of secured claims at confirmation in Chapter 13 cases:

> Oversimplified, under § 506(a) an allowed claim was a secured claim to the extent of the value of the collateral. Undersecured claims were split into secured and unsecured components based

15. See *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295, 1300 (11th Cir. 2008) (collecting cases). In fact, the Kansas bankruptcy district has an internal split of authorities. Unlike Judge Karlin in this case, in *In re Ford*, 387 B.R. 827 (Bankr.D.Kan. 2008), Kansas Bankruptcy Judge Nugent concluded that the negative equity portion of a 910 vehicle debt is protected from cram down in a Chapter 13 plan.

16. *Graupner*, 537 F.3d 1295.

17. *In re Price*, 562 F.3d 618 (4th Cir.2009). *In re Ford, supra* note 15, at 378, is currently on direct appeal before the Tenth Circuit Court of Appeals in Case No. 08–3192. Additionally, it appears that the issue is now pending before the Second, Fifth, Sixth, Eighth, and Ninth Circuits. See *Clarks' Secured Transactions Monthly*, March 2009.

18. *Price*, 562 F.3d at 621; *Graupner*, 537 F.3d at 1302.

19. Given the plethora of published decisions expounding upon this issue, the following analysis is guided by the principle that sometimes less is more. For an extensive discussion of this and other issues arising under the hanging paragraph, *see* Robin Miller, Annotation, *Effect of "Hanging" or "Anti–Cram-down" Paragraph Added to 11 U.S.C.A. § 1325(a) by BAPCPA*, 19 A.L.R. Fed.2d 157 (2007).

20. 11 U.S.C. § 506(a)(1).

on the value of the collateral. With or without consent of the lienholder, a Chapter 13 debtor could confirm a plan that proposed to pay the allowed secured claim in full with present value interest and to treat the balance of the debt as an unsecured claim.[21]

However, perceived abuse led to Congressional curtailment of the use of the cram down provision in the case of certain purchase money obligations.[22] The crucial hanging paragraph, added by BAPCPA, provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a *purchase money security interest securing the debt that is the subject of the claim,* the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing[.][23]

Thus, the question in this case is whether the negative equity part of the 910 vehicle debt constitutes debt secured by a purchase money security interest subject to this anti-bifurcation provision.

"Purchase money security interest" is not defined in the hanging paragraph or elsewhere in the Bankruptcy Code. Therefore, the relevant state law definition is applicable.[24] The Kansas version of § 9-103 of the Revised Uniform Commercial Code ("UCC") provides in pertinent part:

**84-9-103. Purchase-money security interest; application of payments; burden of establishing**

(a) Definitions. In this section:

> (1) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and

> (2) "purchase-money obligation" means an obligation of an obligor incurred as *all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.*

(b) Purchase-money security in goods. A security interest in goods is a purchase-money security interest:

> (1) To the extent that the goods are purchase-money collateral with respect to that security interest....[25]

We agree with the *Graupner* and *Price* courts that Official Comment 3 to this section of the UCC is particularly instructive in interpreting the phrases "price" and

---

**21.** *Graupner* at 1297 (quoting Keith M. Lundin, *Chapter 13 Bankruptcy,* at 445-1 (3d ed. 2000 & Supp.2007-1)). The term "cram down" is used because this option does not require the consent of the claim holder. *See In re Jones,* 530 F.3d 1284, 1288 n. 1 (10th Cir.2008) (citing *Till v. SCS Credit Corp.,* 541 U.S. 465, 468-69, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004)). Alternatively, the term "strip down" is used to describe the same process. *See Price,* 562 F.3d at 623.

**22.** *Graupner* at 1297. *See also Price,* 562 F.3d at 628 (BAPCPA's enactment protected car

lenders by forcing would-be Chapter 7 debtors into Chapter 13).

**23.** 11 U.S.C. § 1325(a)(*) (emphasis added).

**24.** *Price,* 562 F.3d at 624.

**25.** Kan. Stat. Ann. § 84-9-103(a) & (b)(1) (West 2001) ("Kan.Stat.Ann.") (emphasis added). The Georgia and North Carolina versions of the above quoted portion of UCC § 9-103 are identical. *See* Ga.Code Ann. § 11-9-103 (West 2001) and N.C. Gen.Stat. Ann. § 25-9-103 (West 2001).

"value given to enable." [26]   Comment 3 explains as follows:

> Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), *the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.*
> *The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation.* Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.[27]

We must determine, therefore, whether the negative equity is part of the price or value given to enable Debtors to acquire rights in or the use of the Corolla, and whether it has a sufficiently close nexus with acquisition of the Corolla.

### B. Negative Equity is Value Given Which Enables and Has a Close Nexus with Acquisition

In this case, the bankruptcy court held that negative equity did not constitute a purchase-money obligation, in part, because it determined that "[p]aying off an antecedent, undersecured loan on another vehicle is not the kind of 'expense' to which [Comment 3] appears to be geared." [28] We acknowledge that this question is a close call, one on which intelligent minds can differ, but decline the Debtors' invitation to strictly limit the term "expenses" as used in Comment 3 to traditional transaction costs only. As pointed out by the *Graupner* court:

> To be sure, as one court has rightly observed, the fact that "attorney's fees" are listed in Comment 3 "belies the notion that 'price' or 'value' is narrowly viewed as only those [traditional] expenses that must be paid to drive the car off the lot. Comment 3 expressly 'includes' the broad phrase 'obligations for expenses incurred in connection with acquiring rights in the collateral'" and, consequently, "the definitions of 'price' and 'value' should be interpreted broadly." [29]

Broadly interpreting "value given to enable" also comports with the factual realities of the industry practice of financing negative equity. As depicted by the *Price* court:

> [T]he value given by [seller] to pay off the [debtors'] negative equity "enabled" the [debtors] to acquire the new vehicle. That is because the negative equity financing was integral to the whole transaction in which the new vehicle was purchased. All of the [debtors'] debt to [creditor] was incurred at the same time, in the same contract, and for the same purpose: acquiring the new car. In oth-

---

**26.** *Graupner,* 537 F.3d at 1301 n. 4; *Price,* 562 F.3d at 626.

**27.** Kan. Stat. Ann. § 84–9–103, cmt. 3 (emphasis added).

**28.** *In re Padgett,* 389 B.R. 203, 209.

**29.** *Graupner,* 537 F.3d at 1302 (quoting *In re Myers,* 393 B.R. 616, 620–21 (Bankr.S.D.Ind. 2008) (emphasis omitted)). *See also Price,* 562 F.3d at 626.

er words, the negative equity financing enabled the purchase of the new car because the negative equity financing and the purchase were a "package deal."[30]

Because the negative equity is inextricably intertwined with the sales transaction, it also meets the close nexus requirement:

> Payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction, and utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle.... [T]he negative equity was an "integral part of," and "inextricably intertwined with," the sales transaction.[31]

The negative equity enabled Debtors to acquire the Corolla, and it has a sufficiently close nexus to the acquisition. Accordingly, it constitutes a purchase money obligation.

## C. Affording Anti–Bifurcation Protection to Negative Equity is Consistent with Congressional Intent

Additionally, we agree with the *Graupner* and *Price* courts that holding negative equity to be a purchase money obligation likely comports with Congressional intent. Though the legislative history is sparse, one commentator has declared, "no one doubts that the hanging-[paragraph] architects intended only good things for car lenders and other lienholders."[32] In fact, section 306 of BAPCPA, which added the hanging paragraph, was entitled "Giving Secured Creditors Fair Treatment in Chapter 13.... Restoring the Foundation for Secured Credit."[33] "Thus, whatever else may be said about the hanging paragraph, it seems clear that by it 'Congress intended to take away the right of debtors to reduce their secured obligations on retained 910 vehicles to the value of the vehicles.'"[34] Negative equity financing was common prior to enactment of BAPCPA, and continues to be so. As a result, we, like the *Price* court, think it unlikely that Congress intended the hanging paragraph to be interpreted in such a way as to deny its protections to a large percentage of claims held by car lenders.[35]

## V. CONCLUSION

We conclude that the negative equity is debt secured by a purchase money security interest. Therefore, the hanging paragraph of § 1325(a)(5) prevents Debtors from cramming down AmeriCredit's 910 vehicle claim through their Plan. Accordingly, we REVERSE the bankruptcy court's order confirming the Debtors' Plan.

STARZYNSKI, Bankruptcy Judge, concurring.

I concur in the Court's decision to reverse the bankruptcy court's decision, but I respectfully reach that conclusion on a different basis than that of the majority.

The statute at issue, frequently referred to as the "hanging paragraph" and found at or after § 1325(a)(9)[1], reads in relevant part as follows:

30. *Price*, 562 F.3d at 625 (citing *Graupner*, 537 F.3d at 1302).

31. *Graupner*, 537 F.3d at 1302.

32. Keith M. Lundin, *Chapter 13 Bankruptcy*, at 451.5–1 (3d ed. 2000 & Supp.2007–1).

33. *See* Pub.L. No. 109–8, § 306, 119 Stat. 23, 80 (2005).

34. *Graupner*, 537 F.3d at 1297–98 (quoting *In re Rodriguez*, 375 B.R. 535, 548 (9th Cir.BAP 2007)).

35. *Price*, 562 F.3d at 628–29.

1. I use the term "hanging paragraph" instead of " § 1325(a)(*)", since the asterisk " * " is a universal expander for searches in Westlaw and Lexis. *In re Sanders*, 377 B.R. 836, 842

"For purposes of paragraph (5) [§ 1325(a)(5)], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor[.]"

Section 506(a)(1)[2] is the part of the Code that allows a secured claim to be bifurcated into a secured claim equal to the value of the collateral and an unsecured claim for the balance.[3]

Thus, the hanging paragraph does not permit a Chapter 13 plan to bifurcate or write down the secured claim on a vehicle if 1) the creditor has a purchase money security interest ("PMSI") securing the debt, 2) the debt was incurred within 910 days of the filing of the petition, 3) a motor vehicle is the collateral securing the debt, and 4) the debtor acquired the motor vehicle for his or her personal use. In the Joint Stipulation of facts before the Court, the parties agreed that 1) the debt was incurred 178 days before filing for bankruptcy, and 2) a 2006 Toyota Corolla is the collateral securing the debt. The stipu-

lated facts do not explicitly address the use of the vehicle, but implicit in this appeal is the understanding that Debtors purchased the vehicle for their personal use. The sole remaining issues then are whether AmeriCredit "has a PMSI securing the debt that is the subject of the claim,"[4] and if so, what is the effect of that fact.

**Whether AmeriCredit has a PMSI "securing" the debt**

Whether AmeriCredit has a PMSI "securing" the debt is answered by resort to Kansas law.[5] A PMSI in a vehicle, under Kansas law, is not an automatically perfected security interest for any period of time. Rather, a PMSI, and for that matter a non-PMSI, is perfected *only* by the certificate-of-title statute. Kan. Stat. Ann. § 8–135.

Section 9–310(a) of the Kansas version of the Uniform Commercial Code (Kansas Statute § 84–9–310(a)) says that generally a financing statement is required in order to perfect a security interest. *Id.* § 84–9–310(a). Section 84–9–310(b)(2), however, says that a financing statement is not necessary to perfect a security interest if it is, *inter alia,* a PMSI, referring to § 9–309. *Id.* § 84–9–310(b)(2). That section provides that [t]he following security interests are perfected when they attach: "(1) A

---

n. 3 (Bankr.W.D.Tex.2007), *rev'd on other grounds,* 403 B.R. 435 (W.D.Tex.2009).

**2.** That *statute provides in relevant part as* follows:
  An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. *See also Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 956, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

**3.** "The purpose of the hanging paragraph is to remedy a perceived abuse by debtors who would purchase a new vehicle shortly before, or even on the eve of, filing a bankruptcy petition and then immediately strip down the secured claim of the vehicle lender as part of their Chapter 13 plan." *In re Brodowski,* 391 B.R. 393, 403 (Bankr.S.D.Tex.2008).

**4.** *See* hanging paragraph.

**5.** The majority of course is correct in citing state law for definitions of purchase money security interest, etc.

purchase money security interest in consumer goods, except as otherwise provided in K.S.A. 84–9–311(b) ... with respect to consumer goods that are subject to a statute or treaty described in K.S.A. 84–9–311(a)[.]" *Id.* § 84–9–309(1).

Section 84–9–311(a) provides that

the filing of a financing statement is not necessary *or effective* to perfect a security interest in property subject to ... (2) any certificate-of-title law of this state covering automobiles ... which provides for a security interest to be indicated on the certificate. Such security interest shall be deemed perfected upon the mailing or delivery of the notice of security interest and tender of the required fee to the appropriate state agency as prescribed by subsection (c)(5) of K.S.A. 8–135[.]

*Id.* § 84–9–311(a)(1) (emphasis added). And, § 84–9–311(b) provides that

"[c]ompliance with the requirements of a statute ... described in subsection (a) for obtaining priority over the rights of a lien creditor is equivalent to the filing of a financing statement under this article. Except as otherwise provided in [sections not relevant] for goods covered by a certificate of title, a security interest in property subject to a statute ... described in subsection (a) may be perfected *only* by compliance with those requirements...."

*Id.* § 84–9–311(b) (emphasis added).

Finally, Kansas Statute § 8–135(c)(5) provides in relevant part that a "dealer or secured party may complete a notice of secured interest," and "the proper completion and timely [*i.e.*, within 30 days] mailing or delivery of a notice of security interest ... shall perfect a security interest in the vehicle, as referenced in K.S.A. 84–9–311[.]." *Id.* § 8–135(c)(5).

Kansas case law almost uniformly bears out this analysis that a security interest in a vehicle may only be perfected by compliance with the certificate of title statute. *Morris v. Hicks (In re Hicks),* 491 F.3d 1136, 1140 (10th Cir.2007); *Redmond v. MHC Fin. Servs., Inc. (In re Barker),* 358 B.R. 399, 406–411 (Bankr.D.Kan.2007); *Morris v. Intrust Bank, N.A. (In re Anderson),* 351 B.R. 752 (Bankr.D.Kan. 2006); *Mid Am. Credit Union v. Board of County Comm'rs of Sedgwick County,* 15 Kan.App.2d 216, 806 P.2d 479 (1991); *Beneficial Fin. Co. v. Schroeder,* 12 Kan. App.2d 150, 737 P.2d 52 (1987); *contra, Davis v. Charlies Cars, Inc. (In re Cruth),* 332 B.R. 16, 18–19 (Bankr.D.Kan.2005) (an enabling loan [PMSI] provides perfection automatically for 20 days following the delivery of the collateral, referring to Kansas Statute § 84–9–317(e)). With respect to the *Cruth* court, the foregoing analysis of the Kansas version of Article 9 illustrates that PMSI by itself does not perfect an interest in vehicles, whereas § 84–9–317(e) says what happens when PMSI does apply. In any event, the *Cruth* court's statement about PMSI is dicta because the creditor in *Cruth* did not meet any of the perfection deadlines, including the 20–day relation-back period that it would have been entitled to had PMSI applied to auto loans.

Thus, if the term "securing" is read to imply a perfected security interest, then under Kansas law the PMSI does not "secure" the debt for purposes of the hanging paragraph. In consequence, Chapter 13 debtors would not be precluded from using § 506 to write down the secured claims on 910 vehicles acquired for personal use.

However, the term "securing" by itself need not imply perfection. Under § 101 of the Bankruptcy Code there is no definition of the word "securing", although there are definitions of "security agreement" (agreement that creates or provides for a

security interest), "security interest" (lien created by agreement), and "lien" (charge against or interest in property to secure payment of a debt or performance of an obligation). 11 U.S.C. § 101(50), (51), and (37) respectively. The definitions section of the Kansas secured transactions statutes, § 84–9–102, also does not define "securing" as such, but it does define "secured party" as a "person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding." Kan. Stat. Ann. § 84–9–102(a)(71)(A). And it has the same definition for "security agreement" as the Bankruptcy Code. *Id.* § 84–9–102(a)(72). Black's Law Dictionary defines "secured", when speaking of a debt or obligation, as "supported or backed by security or collateral" or, when speaking of a creditor, as "protected by a pledge, mortgage, or other encumbrance of property that helps ensure financial soundness and confidence." *Black's Law Dictionary* 1357 (7th ed.1999). Black's further defines "secured transaction" as "[a] business arrangement by which a buyer or borrower gives collateral to the seller or lender to guarantee payment of an obligation." *Id.* So common usage of "securing" requires that the debt be backed by collateral, but does not require that the lien be perfected.

Further support for this minimalist construction of "securing" is derived from the purpose of the statute. Congress intended to halt the practice of writing down secured claims on recently purchased PMSI vehicles. *In re Brodowski,* 391 B.R. 393, 403 (Bankr.S.D.Tex.2008). And the statute was written to benefit vehicle financing creditors. *Capital One Auto Fin. v. Osborn,* 515 F.3d 817, 821 (8th Cir.2008) (holding that surrender of the vehicle does not make the obligation non-recourse). In consequence, it makes sense to choose a construction of the term "securing" which

does not require perfection because that interpretation implements the legislative intent of the statute.

In the present case, the parties have stipulated to the fact that the 2006 Toyota Corolla secures the $22,470.12 debt for which AmeriCredit filed a proof of claim. App. Appx. A65. That is sufficient to make applicable the hanging paragraph and its prohibition of the use of § 506 to write down the value of the vehicle.

## The effect of AmeriCredit having a PMSI securing the debt.

In general, there is no issue that the purchase price of a vehicle, including the sticker price, taxes and licensing fees, dealer fees, and similar charges, are treated as paid for by PMSI and therefore the hanging paragraph prohibits the use of § 506(a)to reduce that figure. But does the hanging paragraph also prohibit the write down of the amount of the debt attributable to negative equity, that is, the amount of the balance owed on the traded-in vehicle that the dealer had to pay off as part of the overall transaction? As the majority points out, there is extensive case law on this issue. *See, e.g., In re Munzberg,* 388 B.R. 529, 538 (Bankr.D.Vt.2008) (collecting cases; holding that negative equity is not part of PMSI); *In re Ford,* 387 B.R. 827, 830 nn. 13 and 14 (Bankr.D.Kan. 2008); and *Graupner v. Nuvell Credit Corp. (In re Graupner),* 537 F.3d 1295, 1300–01 (11th Cir.2008) (collecting cases; holding that negative equity is part of PMSI). And it was on this basis that the parties argued the case to the bankruptcy court and upon which the bankruptcy court decided the case. However, that formulation of the issue misapprehends the statute as written. For this analysis, the key language in the statute is as follows:

For purposes of paragraph (5), section 506 shall not apply to *a claim* described

in that paragraph if the creditor has a purchase money security interest securing *the debt that is the subject of the claim* [.]

*See* hanging paragraph (emphasis added). In different contexts, the Tenth Circuit has construed this language. In *In re Ballard*, 526 F.3d 634 (10th Cir.2008), the court held that the hanging paragraph did not preclude a creditor from filing an unsecured claim for the deficiency when a Chapter 13 debtor attempted to surrender a 910 vehicle in full satisfaction of the claim. In the course of ruling that the source of the creditor's right to a deficiency claim was state law, the court discussed the effect of the hanging paragraph in the circumstances of this case and stated in part as follows:

> Because the valuation provision of § 506(a) no longer applies to bifurcate the creditor's claim into secured and unsecured portions, a debtor who keeps the 910 vehicle under § 1325(a)(5)(B) must now pay *the entire claim as filed.* In other words, a 910 car claim under § 1325(a)(5)(B) is treated as fully secured.

*Id.* at 638 (emphasis added). The court went on to state that "[b]ecause the statutory language is clear, we need not look beyond it," citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). *Ballard*, 526 F.3d at 638.

As it happens, *Ron Pair Enterprises* speaks to this issue of a unitary claim as well, stating that

> Subsection (a) of § 506 provides that *a claim* is secured only to the extent of the value of the property on which the lien is fixed; *the remainder of that claim* is considered unsecured.

*Id.* at 239, 109 S.Ct. 1026 (emphasis added). *See also Nobelman v. Am. Savs.*

*Bank*, 508 U.S. 324, 329, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993):

> [T]he bank is still the "holder" of a "secured claim," because petitioners' home retains $23,500 of value as collateral. The portion of the bank's claim that exceeds $23,500 is an "unsecured claim componen[t]" under § 506(a)[.]

*Id.* (citation to *Ron Pair Enters.* omitted). Thus the treatment by the Ballard court of the claim as filed, derived from state law, as a single claim is the correct application of the statute. *See also In re Jones*, 530 F.3d 1284 (10th Cir.2008):

> Thus, a claim that is allowed under § 502 and secured by a lien on a 910 vehicle is an "allowed secured claim" under § 1325(a)(5). Moreover, because a 910 car claim is not subject to bifurcation under § 506(a), the holder of such a claim is entitled to the present value of the entire claim under § 1325(a)(5)(B)(ii). Indeed, the language of this provision explicitly requires that property distributions equal the present value of the "claim," not the collateral securing the claim.

*Id.* at 1289 (holding that the debtor must pay interest over the life of a plan on a secured 910 car claim) (citations omitted).

What these cases stand for is the proposition that even with the creditor's rights deriving from state law, the secured and unsecured components together constitute one claim. In consequence, when the hanging paragraph talks about "the debt that is the subject of the claim", it is speaking about a single claim, not two claims of which one would be secured and the other unsecured. Thus the wording "section 506 shall not apply to a claim" means, tautologically, that the entire (unitary) claim is immune from the application of § 506.

At least two district court cases have adopted this starting point in deciding the

reach of the hanging paragraph's prohibition of the use of § 506(a). *In re Dale,* Case No. H–07–32451, Adv. No. H–07–3176, 2008 WL 4287058, at *1 (S.D.Tex. Aug.14, 2008); *In re Sanders,* 403 B.R. 435, 438–39 (W.D.Tex.2009). In *Dale,* the bankruptcy court had divided the creditor's claim into PMSI secured claim and non-PMSI unsecured claim. *Dale* at *1. The district court reversed:

> A plain reading leaves no question that the hanging paragraph eliminates the federal remedy of bifurcation of claims into secured and unsecured.... The court declines to parse the statutory language and read into the paragraph's reference to a "purchase money security interest" a newly enacted federal bifurcation remedy.

*Id.* at *4. The court went on to conclude that "[b]ecause absent § 506's bifurcation mechanism no cramdown is available under federal law, the entire claim, not just the purchase money portion, is secured." *Id.*

Similarly, in *Sanders,* the District Court for the Western District of Texas on similar facts stated,

> "[T]he plain meaning of the hanging paragraph does not require the *entire* portion of the debt that is the subject of its claim to be secured by a purchase-money security interest.... The terms of the statute do not limit its application

'to the extent' that the creditor has a purchase-money security interest or to the 'portion' of the debt secured by a purchase-money security interest.... Rather, the plain statutory language is broad and unqualified, applying to situations where, as here, the creditor has *a* purchase-money security interest which secures the debt."

*Sanders,* 403 B.R. at 439 (citations omitted).

Thus, a straight-forward reading of the hanging paragraph mandates that § 506(a) may not be applied to any portion of AmeriCredit's claim.

## Were the PMSI and non-PMSI distinction in Kansas law to be determinative, the bankruptcy court decision would have to be affirmed.

The foregoing "plain-language" analysis calls into question the need for the analysis contained in cases such as *Graupner v. Nuvell Credit Corp. (In re Graupner),* 537 F.3d 1295 (11th Cir.2008) and *Wells Fargo Financial Acceptance v. Price (In re Price),* 562 F.3d 618 (4th Cir.2009).[6] In fact, *Graupner* and *Price,* had they been decided taking into account the PMSI and non-PMSI distinction in Kansas law, would be wrongly decided. That is the reason they should not be relied on.

The Kansas version[7] of the Revised Uniform Commercial Code states that "[a]

---

6. The same can be said of the second part of the district court's *Sanders* opinion. *Sanders,* 403 B.R. at 440–444.

7. Kansas and five other states removed from 9–103 an exemption for consumer goods transactions in subsections (e), (f) and (g) and deleted subsection (h) in its entirety. Christopher Harry, Comment, *To Be (Transformed), or Not To Be: The Transformation Versus Dual-Status Rules for Purchase Money Security Interests Under Kansas' Former and Revised Article 9,* 50 U. Kan. L.Rev. 1095, 1124 (June, 2002) (*"Comment"*). The result is that sub-

sections (e), (f) and (g) now apply to consumer transactions as well as commercial transactions. *See also Keith G. Meyer, A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code,* 50 U. Kan. L.Rev. 143, 157–58 (2001) (*"Meyer"*). Kansas Statute § 84–9–103(e) deals with application of payments, and is not relevant to this appeal. Kansas Statute § 84–9–103(f) is the legislative adoption of the "dual status" theory which allows a mixing of PMSI and non-PMSI security interests in the same collateral. It reads: "A purchase-money security interest does not lose its status as

security interest in goods is a purchase money security interest [to] the extent that the goods are purchase-money collateral with respect to that security interest[.]" Kan. Stat. Ann. § 84–9–103(b)(1). Purchase money collateral is further defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral[.]" *Id.* § 84–9–103(a)(1). Finally, a purchase money obligation is defined as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." *Id.* § 84–9–103(a)(2). Therefore, it must be determined whether negative equity is an obligation that is either (1) part of the price of the collateral, or (2) value given to enable to debtor to acquire rights in or the use of the collateral if the value was in fact so used.

Official Comment 3 to Kansas Statute § 84–9–103 states that for the purposes of § 84–9–103(a)(2) "the 'price' of collateral or the 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations." Official Comment 3 further states that "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of

collateral and the secured obligation." Kan. Stat. Ann. § 84–9–103, cmt. 3.

## A. *Negative equity is not part of the price of the collateral.*

To begin with, the language in the statute—"[a] security interest in goods is a purchase-money security interest *to the extent* that the goods are purchase-money collateral"—immediately suggests that not everything expended in the transaction will be a PMSI. *Id.* at § 84–9–103(b)(1) (emphasis added). In fact, Kansas Statute § 84–9–103(f) explicitly adopts the "dual status" theory which provides that purchase money collateral can also secure a non-purchase money advance. *See In re Vega,* 344 B.R. at 622 n. 29 (Bankr.D.Kan. 2006).

AmeriCredit suggests that we should reverse the bankruptcy court in this case because it failed to consider the impact of the federal Truth in Lending Act ("TILA"). And in fact many cases that find that negative equity is a component of price do so through reference to other federal or state statutes that those courts find are *in pari materia* with the state's Uniform Commercial Code. *See, e.g., GMAC v. Horne (In re Horne),* 390 B.R. 191, 202–03 (E.D.Va.2008) (UCC should be read in conjunction with the Virginia Retail Installment Sales Act and TILA.); *Graupner,* 537 F.3d at 1301 (court reads UCC with Georgia's Motor Vehicle Sales Finance Act[8]); *GMAC v. Peaslee,* 373

---

such, even if: (1) The purchase-money collateral also secures an obligation that is not a purchase-money obligation; (2) collateral that is not purchase-money collateral also secures the purchase-money obligation; or (3) the purchase-money obligation has been renewed, refinanced, consolidated, or restructured." Kansas Statute § 84–9–103(g) reads: "A secured party claiming a purchase-money security interest has the burden of establishing the

extent to which the security interest is a purchase-money security interest."

8. Kansas does not have a similar Motor Vehicle Sales Finance Act. *Citifinancial Auto v. Hernandez–Simpson,* 369 B.R. 36, 48 n. 76 (D.Kan.2007). "It is clear to this Court, however, that the *Graupner* court's reliance on Georgia statutory law makes that case easily distinguishable and therefore of little persuasive value." *Id.* at 48. The *Graupner* decision

B.R. 252, 260–61 (W.D.N.Y.2007) (court reads UCC with New York's Motor Vehicle Retail Installment Sales Act).[9] *But compare, In re Brodowski*, 391 B.R. 393, 399–400 (Bankr.S.D.Tex.2008). Other cases also refuse to apply the doctrine. *See, e.g., In re Penrod*, 392 B.R. 835, 849–50 (9th Cir. BAP 2008) (use of *in pari materia* would require the court to use a state-law based interpretive rule to construe how a federal statute would incorporate a state statute. "That is too convoluted."); *Munzberg* 388 B.R. at 543 (TILA cannot be read *in pari materia* with the UCC because it is a consumer disclosure statute that does not authorize or permit security interests in consumer goods; the proper place to look for the creation of security interests is the UCC. Disclosure of negative equity does not transform it into a cost of the vehicle.).

> The TILA does not determine whether a PMSI is created by the credit transaction. The TILA is a federal disclosure law, requiring creditors to make certain disclosures to consumer-borrowers concerning the cost of credit. A PMSI, on the other hand, is determined in accordance with *state law*. Here, that state law is Revised Article 9, as adopted in Kansas, which defines a PMSI.

*Ford*, 387 B.R. at 833 (footnotes omitted).

The *Munzberg* and *Ford* courts, among others, are correct that the consumer protection provisions of TILA should not be read into the UCC. Other than the general statement that Congress is presumed to be aware of other statutes when it legislates,

there is no basis for assuming that Congress meant to in effect incorporate TILA or any other consumer protection legislation, federal or state, into the hanging paragraph. Congress could have done so, of course, as illustrated by the specific reference it made in the statute to section 30102 of Title 49 to define the term "motor vehicle." It did not. Thus while every consumer vehicle sale must comply with TILA, the requisite disclosure of the transaction is clearly not the same thing as the creation of a PMSI, and therefore does not thereby make the entire transaction a PMSI.

The argument against incorporating other statutes by implication is even stronger when taking into consideration that the PMSI decision is determined by reference to state law. As is clear, Congress declined to define PMSI in the hanging paragraph. Consistent with longstanding precedent, a court must therefore look to state law to determine the rights of the parties. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *In re Billings*, 838 F.2d 405, 406 (10th Cir.1988) (holding that refinance of debt by same creditor does not necessarily cause the loss of PMSI status). What AmeriCredit and Amicus are in actuality arguing is that in legislating BAPCPA, Congress intended to incorporate federal, and perhaps state, consumer protection laws into the Kansas Uniform Commercial Code. Such an argu-

---

that the district court was referring to was the bankruptcy court decision. *In re Graupner*, 356 B.R. 907, 920–21 (Bankr.M.D.Ga.2006). However, the Eleventh Circuit Court of Appeals, affirming, used the same reasoning as the *Graupner* bankruptcy court. *Graupner v. Nuvell Credit Corp.*, 537 F.3d at 1301.

9. *Peaslee* is on appeal to the Court of Appeals for the Second Circuit, which has certified to the Court of Appeals of New York the question of whether a lender had a PMSI for sums advanced to pay off negative equity on a trade-in. *See Reiber v. GMAC, LLC (In re Peaslee)*, 547 F.3d 177 (2d Cir.2008) and *Reiber v. GMAC, LLC (In re Peaslee)*, 11 N.Y.3d 838, 872 N.Y.S.2d 57, 900 N.E.2d 537 (2008).

ment, whether made explicitly or implicitly, is completely devoid of any evidence that Congress had any such thought or ought to be deemed to have had any such intention.

Other cases that include negative equity in price do so through reliance on Official Comment 3. These courts place emphasis on the phrase "obligations for expenses incurred in connection with acquiring rights in the collateral" and conclude that negative equity payoffs are such expenses. *E.g., Price,* 562 F.3d at 626–28; accord, Peaslee, 373 B.R. at 258–59 ("If the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how that could *not* be viewed as an [obligation for expenses incurred in connection with acquiring rights in the collateral].").

Yet other cases rely on Official Comment 3 for the contrary proposition. These cases focus instead on the phrase "and other similar obligations" to find that negative equity is not a similar obligation. *See Penrod,* 392 B.R. at 848 ("[N]egative equity is not of the same 'type' or 'magnitude' as the expenses listed in Official Comment 3."); *In re Padgett,* 389 B.R. 203, 209 (Bankr.D.Kan.2008) (Finding that "other similar obligations" must be of the same type of obligations listed in Official Comment 3 in order to be included in PMSI.); *and compare Munzberg,* 388 B.R. at 541 (a broad construction of "expenses incurred in connection with acquiring rights in the collateral" is inconsistent with the UCC).

As is explained in more detail below, the "close nexus" test has nothing to do with eliminating negative equity from PMSI status; it has rather to do with whether funds loaned by a third party are actually used to purchase something. In conse-

quence, the "close nexus" test, while persuasive to the majority, does not really support the position of AmeriCredit and Amicus.

And, the definition of purchase money obligation itself limits itself to "all or part" of the price of the collateral, suggesting that the "price" is the upper limit. Interpreting price in this fashion also makes common sense.

While reasonable minds could dither over whether "price of the collateral" ought to include accessories or the tax, title, and license fees associated with the purchase of the vehicle in question, the person on the street might be surprised to learn that a court had concluded that the cost of paying off the excess loan on the trade-in should also count as "the price" of the vehicle itself. When the transaction is teased apart, it becomes readily obvious that a portion of this loan is actually an advance (in legal effect to the debtor, but in practical effect to the dealer) to pay off the negative equity from the trade-in. Retiring this overhang from the old vehicle may effectuate the transaction, but effectuating the transaction does not make this portion of the transaction part of the purchase price of the new vehicle that the debtors in this case purchased.

*In re Sanders,* 377 B.R. 836, 852, *rev'd, In re Sanders,* 403 B.R. 435 (W.D.Tex.2009).

There is also a historical reason that negative equity does not represent PMSI. Negative equity is antecedent debt. *Penrod,* 392 B.R. at 842; *Munzberg,* 388 B.R. at 539. It represents debt in excess of the value of a presently owned vehicle. Official Comment 2 to former UCC § 9–107 (the precursor to Revised UCC § 9–103) explicitly provided that a PMSI could not secure a pre-existing claim or antecedent debt. *See Billings,* 838 F.2d at 407. Current Official Comment 5 to Kansas Statute

§ 84–9–103 states that subsections (b) and (c) limit PMSIs to security interests in goods, fixtures and software, but "[o]therwise, no change in meaning from former Section 9–107 is intended." Therefore, the Court should not presume that Kansas Statute § 84–9–103's definition of PMSI has changed from former UCC 9–107. *See also Munzberg* 388 B.R. at 539–40 (same).

For these reasons, "price of the collateral" does not include negative equity.

### B. *Negative equity is not value given to enable to debtor to acquire rights in or the use of the collateral and it was not in fact so used.*

A PMSI can also arise based on "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Kan. Stat. Ann. § 84–9–103(a)(2). The payment of $11,350 of negative equity was not in fact used to acquire rights in the new vehicle. It was payment of an antecedent unsecured debt. *See In re Johnson,* 380 B.R. 236, 243 (Bankr.D.Or.2007) ("[T]he liability for negative equity is not an expense 'incurred in connection with acquiring' the Vehicle; it is an antecedent debt."); *Munzberg,* 388 B.R. at 539 ("Negative equity is antecedent debt, as it represents the amount financed on a debtor's previous car (Car 1) that remained unpaid at the point the debtor was in the process of purchasing a new car (Car 2). As such, the negative equity, and the collateral to which it was attached, pre-dated the purchase of Car 2."). The negative equity funds are not being advanced to obtain rights in any collateral, except in the most general sense (much more general than the Kansas statute contemplates) of enabling the transaction to take place and thereby allowing the creditor to obtain an interest in the collateral. Rather, the collateral (the formerly owned vehicle) is basically gone. So the negative equity financing cannot be "value given to enable." *See* Kan. Stat. Ann. § 84–9–103(a)(2).

The majority, following the lead of *Graupner,* 537 F.3d at 1302 and *Price,* 562 F.3d at 626, places great emphasis on the transaction as a "package deal": Debtors would not have been able to obtain the newer vehicle without trading in the older vehicle and obtaining the dealer's financing of the negative equity. No doubt the transaction was a package deal, but the fact that this single transaction had two different aspects does not mean that each aspect of the package was a PMSI. *Compare, e.g., Peaslee,* 373 B.R. at 259 ("Where the parties to the transaction agree to a 'package transaction' in which '[t]he negative equity is inextricably intertwined with the sales transaction and the financing of the purchase,' one could certainly conclude that '[t]his close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of the collateral.' ") (citation omitted), *with In re Hayes,* 376 B.R. 655, 671 (Bankr.M.D.Tenn.2007) ("Some courts have given too much weight to the presence of a single contract that includes multiple transactions."). In fact, Kansas law now clearly provides that "a security interest in goods is a PMSI to the extent that the goods are purchase-money collateral, and non-PMSI as to the remainder." *Vega,* 344 B.R. at 622 n. 29, explaining the change in the law and citing *Comment* at 1122.[10] Thus, characterizing the "pack-

---

**10.** Prior to Kansas' adoption of its version of section 9–103, commingling PMSI and non-PMSI security interests created the risk for the creditor of the entire security interest be-

coming non-PMSI. This change was termed "transformation." "The 'dual status' doctrine holds that the mere presence of a non-PMSI does not destroy the purchase-money aspect

age" as giving AmeriCredit the benefit of PMSI for the vehicle and non-PMSI status for the negative equity fits neatly into Kansas law as it now reads.[11]

Essentially AmeriCredit and Amicus are arguing a "but for" definition of the "value given to enable"[12] standard of the statute, sounding vaguely like a tort concept. Since the wording at issue is in the UCC, it should be read in a commercial context. And it should parallel the term "price". Thus the "value given to enable" language refers to the circumstance in which the buyer obtains a loan from a third party and then uses the loan funds to purchase the collateral, and provides to the lender a PMSI in the collateral. *Comment* at 1097–98.

> Under these definitions, like under former section 9–107, two types of PMSIs in goods or software can exist. One is held by sellers to secure the buyer's obligation to pay, and the other is held by a qualifying lender.
>
> While a seller can normally establish the PMSI without difficulty, lenders must show that the loan "enabled" the debtor to acquire the good and that the money was in fact used to purchase the good; i.e., the funds must be traced. The tracing problem is solved by the lender issuing a check to the seller of the good or a joint payee (debtor and seller) check.

*Meyer* at 153 (footnotes omitted).

And it is in this context—determining whether the borrowed funds *are used to purchase a good* thereby creating pur-

chase-money collateral—that the "close nexus" test arises.

> The concept of "purchase money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

Kan. Stat. Ann. § 84–9–103, cmt. 3. "The enabling requirement can present an issue if the purchase is made a long time after the loan or if the debtor purchases the good before the loan is in fact made." *Meyer* at 153. The "close nexus" test applies to the narrow issue of whether the loaned funds were used to purchase the collateral. This requirement is at the heart of any PMSI:

> Thus, in order to have a PMSI, an otherwise secured party must satisfy two key elements: (1) that the money loaned or credit extended made it possible for the debtor to obtain the collateral; and (2) that the debtor used the funds supplied to acquire rights in the collateral.

*Hernandez–Simpson*, 369 B.R. at 45–46.

In these "negative equity" cases, the loan that represents the payoff of the traded in vehicle is not money advanced to the borrower (debtor) to purchase anything. The borrower in fact loses ownership of the trade in. Thus cases, and arguments, which apply the "close nexus" test broadly to the entire transaction by arguing, for

---

of the original transaction." *Meyer* at 155; *see* Kan. Stat. Ann. § 84–9–103(f). A detailed history of the transformation/dual status rules under former and current Article 9 in Kansas is set out in *Comment* at 1102–22.

**11.** Interestingly, the current section 9–103 apparently owes its non-uniform wording to the Kansas Bankers Association, which appears

as Amicus in this appeal. *Comment* at 1120–23.

**12.** "[A]n obligation ... incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Kan. Stat. Ann. § 84–9–103(a)(2).

example, that there is a "close nexus" between the purchase of another vehicle and funding the negative equity, fundamentally misapprehend the statute and the explanatory comment. *E.g.*, *Price*, 562 F.3d at 625–26; *Graupner*, 537 F.3d at 1302; *Peaslee*, 373 B.R. at 258–59. They effectively talk about "value given to enable" in a vacuum, untethered to the meaning of that phrase in the context of a third-party lender advancing funds for the direct purchase of something. And they overlook that PMSI claims are to be construed narrowly since they are in derogation of the rights and interests of other creditors. *Munzberg*, 388 B.R. at 541; *accord, In re Mitchell*, 379 B.R. 131, 141 (Bankr. M.D.Tenn.2007).[13]

> In summary,
>
> [p]roviding a loan to refinance negative equity on a trade-in, which may be a convenient but unnecessary option for a consumer purchasing a replacement vehicle, is not value given to "enable" that consumer to acquire rights in or the use of the replacement collateral. The term "enable" refers to what is has always referred to, which is the value given to allow the debtor to pay, in whole or in part, the actual price of a new item of collateral being acquired, in these cases the replacement vehicles themselves[.]

*Hernandez–Simpson*, 369 B.R. at 48 (footnote omitted citing *In re Peaslee*, 358 B.R. 545, 557 (Bankr.W.D.N.Y.2006), *rev'd,*

*GMAC v. Peaslee (In re Peaslee)*, 373 B.R. 252 (W.D.N.Y.2007)).

The majority also cites the fact that the section in BAPCPA that contains the 910 vehicle rule is entitled "Giving Secured Creditors Fair Treatment in Chapter 13," and that Congress intended to provide favored treatment to vehicle financiers by preventing debtors from writing down the value of 910 vehicles. The Eleventh Circuit agrees that the purpose of the hanging paragraph was to "require a debtor electing to retain a '910 vehicle' to pay the creditor the full amount of the claim and not (as under pre-BAPCPA law) an amount equal to the present value of the car." *Graupner*, 537 F.3d at 1302; *accord, Price*, 562 F.3d at 628–29. The statements are accurate, of course; however, they do not prove what the creditor and Amicus argue them for.[14] The problem that Congress intended to address was the simple one of the debtor purchasing a vehicle and then shortly thereafter filing a Chapter 13 petition and writing down the value of the vehicle. *Brodowski*, 391 B.R. at 403. The more limited benefit of precluding debtors from writing down the PMSI portion of the debt could clearly be deemed to be "fair treatment" for vehicle financiers.[15]

Certainly the Sixth Circuit was correct in stating that "[b]ased upon the legislative history, there is little doubt that the 'hanging sentence architects intended only good things for car lenders and other lienhold-

---

**13.** *Mitchell* holds that the partial PMSI status of the respective creditors' claims precludes the application of the hanging paragraph. I am not citing the case for that proposition, which in any event is contrary to Kansas Statute § 84–9–103(f) (providing for "dual status" of a PMSI and non-PMSI secured claim).

**14.** To be clear, the majority cites that fact merely to show that Congress intended this portion of the statute to benefit vehicle financiers.

**15.** In *Hayes*, Judge Lundin summarizes the "densely ambiguous" legislative history of the hanging paragraph (which he terms the "hanging sentence"), 376 B.R. at 675 n. 29, and provides an addendum setting out the various drafts of the legislation, including the headings. The "fair treatment" term comes from the heading of the applicable portion of BAPCPA.

ers.'" *In re Long*, 519 F.3d 288, 294 (6th Cir.2008). But nothing in the statute or the legislative history says that Congress intended to give car lenders and others not just good things, but everything. In any event, exactly what Congress intended is to be derived from the words of the statute even if one of the parties argues for a different result based on the legislative history. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).[16]

AmeriCredit also relies on the many cases that hold that surrender of the vehicle does not eliminate the debt altogether. The argument essentially is that the statute cannot be construed to permit debtors to make purchase money-secured loans non-recourse, *e.g., In re Wright*, 492 F.3d 829, 832 (7th Cir.2007); *In re Ballard*, 526 F.3d at 638, and therefore a bankruptcy court cannot change the nature of the contract to deprive the creditor of the PMSI status for the entire transaction. The problem with this argument is that surrender is not the mirror image of retaining and paying on a 910 vehicle. *Ballard*, 526 F.3d at 640 ("[T]he language governing the retention and surrender options differs significantly."). Surrender is, however, the mirror image of a non–910 vehicle; that is, a vehicle the secured claim upon which is the written-down value, leaving an unsecured claim for the balance consistent with state law. *Id.* at 636–37 (creditor entitled to file claim for unsecured defi-

ciency following liquidation of collateral). If the debtor retains the non–910 vehicle, the debtor pays the lower secured claim, and perhaps some or all of the unsecured claim; if the debtor surrenders the vehicle, the debtor is credited with the value of the lower secured claim and the debtor perhaps pays some or all of the unsecured claim. In any event, there is little logical connection between the two situations.

Finally Amicus argues darkly that not recognizing negative equity as part of the purchase price will have a devastating effect on future vehicle sales and consumer financing of those sales. The argument is of course pure speculation; no such evidence was presented to the bankruptcy court. But even if the bankruptcy court had made such a finding, the remedy would not be for the court to reinterpret the statute; the remedy would be for Congress to amend the statute. *Lamie v. United States Trustee*, 540 U.S. 526, 542, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statue to conform it to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.") (internal quotation marks omitted).

## Conclusion

While I agree with the Kansas bankruptcy court that, under state law, Kansas

---

**16.** The Eleventh Circuit reasons that because "[r]olling a trade-in's negative equity into the purchase price of a new vehicle was a common occurrence at the time BAPCPA was enacted in 2005, and it still is to this day" (and citing studies in support of the proposition), Congress should be deemed to have recognized this fact and intended to incorporate negative equity into PMSI for purposes of the hanging paragraph. *Graupner*, 537 F.3d at 1303. AmeriCredit and Amicus adopt this argument. The connection is simply too tenuous to support the conclusion. Indeed, one

might more reasonably conclude that if Congress was so aware at the time that negative equity financing was so prevalent (albeit apparently no more than 40% of the total transactions), it would have explicitly defined PMSI to include negative equity financing in a statute which all concede was written specifically to benefit vehicle financiers. *Cf. Brodowski*, 391 B.R. at 403 ("Congress was clearly aware that such a practice existed and could have included more explicit language in BAPCPA if it so desired; it did not do so.").

allows for PMSI and non-PMSI and that the amount the Debtors are trying to cram down fits into the non-PMSI category, its decision must be reversed based on the discussions above regarding the definition of "securing," and the effect of a plain language reading of the hanging paragraph.

