[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13657

_____

D.C. Docket No. 07-00037-CV-CDL-4
BKCY No. 06-40237-BKC-JT

In Re:     STEPHEN MICHAEL GRAUPNER,

Debtor.

_____

STEPHEN MICHAEL GRAUPNER,

Plaintiff-Appellant,

versus

NUVELL CREDIT CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(August 6 , 2008)**

Before TJOFLAT and MARCUS, Circuit Judges, and VINSON,[*] District Judge.

VINSON, District Judge:

This case involves interpretation and application of the so-called "hanging paragraph" in Title 11, United States Code, Section 1325(a)(9), which was added to the Bankruptcy Code ("the Code") by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *See* Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA").[1] Specifically, we are called upon to decide if the anti-bifurcation provision in the hanging paragraph protects against "cramdown" of the negative equity in a trade-in vehicle. This issue has been confronted by a number of bankruptcy and district courts throughout the country (with widely divergent results), but it appears to be of first impression in this or any other circuit.

## I. BACKGROUND

The area of bankruptcy law involved in this case is somewhat complex and, as indicated above, rife with terms of art. For better understanding, we will set

---

[*]Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

[1] The section in question has been called the hanging paragraph because, although it is set forth as a subparagraph following 11 U.S.C. § 1325(a)(9), it is not separately designated by letter or number. Rather, it just "hangs" without ordered designation and without surrounding context. It has been variously referred to by courts as section 1325(a)(9), section 1325(a)(*), and as the "hanging paragraph." For purposes of this opinion, we will use "hanging paragraph" in text and § 1325(a)(*) for citations.

forth a brief discussion of the statutory background before turning to the facts and history of this particular case.

A.     *The Statutory Scheme*

Bankruptcy rehabilitation under Chapter 13 of the Code commonly involves the adjustment of obligations owed to creditors holding liens on the bankruptcy debtor's property. Generally, lien creditors are deemed to hold a secured claim to the extent of the present value of the property that the lien encumbers, while the excess, if any, is treated as a separate and unsecured claim. Section 506(a)(1) of the Code provides in relevant part:

> (a)(1) An allowed claim of a creditor secured by a lien on property . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property[.]

11 U.S.C. § 506(a)(1). In dealing with the allowed secured claims under section

506(a), the Code provides for one of three possible treatments "with respect to each allowed secured claim:" (1) the creditor can accept the debtor's bankruptcy plan for repayment; (2) the debtor can surrender the property securing the claim to the creditor in lieu of repayment; or (3) the debtor can bifurcate the claim into a reduced secured portion equal to the present value of the collateral and an unsecured portion equal to the excess of the claim, and then receive a "cramdown" of the reduced secured claim upon the creditor. *See generally* 11 U.S.C. § 1325(a)(5). Under the "cramdown" option, as the Supreme Court has recognized, "the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.,* the present value of the collateral. The value of the allowed secured claim is governed by § 506(a) of the Code." *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 957, 117 S. Ct. 1879, 1882-83, 138 L. Ed. 2d 148 (1997) (internal citations omitted). "Cramdown" was a familiar and routine occurrence before BAPCPA was enacted in 2005. As Judge Lundin notes in his treatise:

> Prior to BAPCPA, cramdown of secured claims at
>
> confirmation in Chapter 13 cases was uniform and well

understood. Oversimplified, under § 506(a) an allowed claim was a secured claim to the extent of the value of the collateral. Undersecured claims were split into secured and unsecured components based on the value of the collateral. With or without consent of the lienholder, a Chapter 13 debtor could confirm a plan that proposed to pay the allowed secured claim in full with present value interest and to treat the balance of the debt as an unsecured claim.

Keith M. Lundin, *Chapter 13 Bankruptcy*, at 445-1 (3d ed. 2000 & Supp. 2007-1).

However, Congress viewed the pre-2005 use of "cramdown" as abusive, so it amended Section 1325(a) through BAPCPA and added the hanging paragraph, which provides:

> For purposes of paragraph (5), section 506 [cramdown] shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of

value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(*). Although the hanging paragraph has caused significant "confusion and incoherence in the law" and has been rightly criticized for its poor drafting, *In re Long,* 519 F.3d 288, 292 (6th Cir. 2008); *see also In re Carver,* 338 B.R. 521, 523 (Bankr. S.D. Ga. 2006), its legislative history leaves little doubt that its "'architects intended only good things for car lenders and other lienholders.'" *See Long*, *supra,* 519 F.3d at 294 (citations omitted); *see also, e.g., General Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 261 (W.D.N.Y. 2007) ("To the extent that it is possible to glean any Congressional intent behind the hanging paragraph . . . that intent . . . seems to be to protect creditors from the abuse of 'cramdown.'"); *In re Payne*, 347 B.R. 278, 281 (Bankr. S.D. Ohio 2006) ("[T]hrough the BAPCPA amendments to § 1325(a)(5), Congress was attempting to remedy a perceived abuse by those who buy vehicles on credit on the eve of bankruptcy and then utilize the cramdown provisions of the Bankruptcy Code to pay the secured creditor a lesser amount than its full claim."); *In re Duke*, 345 B.R. 806, 809 (Bankr. W.D. Ky. 2006) ("The history [of the hanging paragraph] does indicate that it was meant to discourage bankruptcy abuse. It is interesting to note that the section of BAPCPA that added the hanging paragraph was entitled,

'Section 306-Giving Secured Creditors Fair Treatment in Chapter 13 . . . Restoring the Foundation for Secured Credit.'"). Thus, whatever else may be said about the hanging paragraph, it seems clear that by it "Congress intended to take away the right of debtors to reduce their secured obligations on retained 910 vehicles to the value of the vehicles." *See In re Rodriguez,* 375 B.R. 535, 548 (9th Cir. BAP 2007). To fall within the hanging paragraph and be entitled to this anti-bifurcation protection, four general requirements must be satisfied: (1) the creditor must have a "purchase money security interest" in the collateral; (2) the debt must have been incurred within 910 days before the filing of the debtor's bankruptcy case; (3) the collateral for the debt must consist of a motor vehicle[2]; and (4) the vehicle must have been acquired for the personal use of the debtor. *See generally* 11 U.S.C. § 1325(a)(*). If these requirements are satisfied, the allowed secured claim is fixed at the amount of the creditor's claim without resort to the "cramdown" provision mandated by section 506(a).

B.    *Facts and Procedural History*

The facts of this case are simple, undisputed, and taken almost verbatim from the district court's order. On June 23, 2005, Stephen Michael Graupner

---

[2] The collateral for the debt may consist "of any other thing of value," but in that case, the debt must have been "incurred during the 1-year period preceding that filing." 11 U.S.C. § 1325(a)(*).

("Debtor") purchased a 2005 Chevrolet Silverado pick-up truck from a motor vehicle dealer in Georgia. The vehicle was for his personal use and had a "cash price" of $32,919.12. The dealer agreed to finance the sale pursuant to a retail installment contract, with the seller retaining a security interest in the vehicle to secure the unpaid balance of the total sales price.

As part of the transaction, the Debtor traded in a 2002 Chevrolet Silverado pick-up truck. That vehicle had a "negative equity," with the Debtor owing $6,347.50 more on the vehicle than its then-market value. There is nothing in the record of this case to indicate that the trade-in's negative equity was not bona fide and reasonable in amount. The total sales price of the new vehicle included the negative equity, which had the effect of increasing the purchase price. The total amount financed was $36,384.62. The dealer subsequently assigned the retail installment contract to Nuvell Credit Corporation ("Creditor"), which perfected its security interest by having its lien noted on the title to the new vehicle.

Three hundred and one days later, on April 19, 2006, the Debtor filed for Chapter 13 bankruptcy protection. The Creditor filed its secured proof of claim showing an amount due on the contract of $33,670.31. The Debtor retained the vehicle and listed it on his schedules as being valued at $23,375.00. The Debtor proposed a Chapter 13 plan that sought to modify the Creditor's secured claim of

8

$33,670.31 by bifurcating it into secured and unsecured portions based on the retail value of the vehicle. The Creditor objected to the confirmation of the proposed plan, contending that its secured claim could not be modified through "cramdown" because it fell within the hanging paragraph. The parties agreed that the debt for the vehicle was acquired within 910 days of the filing for bankruptcy and that the vehicle was intended for the Debtor's personal use. Consequently, the only question to be decided in the bankruptcy court was whether the Creditor held a "purchase money security interest" in the vehicle. If it did, the debt could not be bifurcated.

Because the term "purchase money security interest" is not defined in the Code, the bankruptcy court began its analysis by stating that the question of "whether a creditor holds a purchase money security interest is a matter of state law." The bankruptcy court referred to Georgia's version of Article 9 of the Uniform Commercial Code ("UCC"), found in the Official Code of Georgia Annotated ("O.C.G.A.") § 11-9-103, which provides:

> (a) *Definitions*. As used in this Code section, the term:
>
> > (1) "Purchase money collateral" means goods or software that secures a purchase money obligation incurred with respect to that collateral.
> >
> > (2) "Purchase money obligation" means an

9

obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) *Purchase money security interest in goods.* A security interest in goods is a purchase money security interest:

(1) To the extent that the goods are purchase money collateral with respect to that security interest . . . .

The bankruptcy court opined that while the definition of "purchase money obligation" in section 11-9-103 appears clear at first glance, it becomes blurred and ambiguous when one attempts to define "price" in subsection (a)(2) because "the extent or reach of the term is uncertain." The bankruptcy court then went on to determine that "price" is more properly understood when viewed in conjunction with a separate, but related, section of the O.C.G.A.: the 1999 amendments to the Georgia Motor Vehicle Sales Finance Act ("MVSFA"), which specifically defines "cash sale price" to include "any amount paid to the buyer . . . to satisfy . . . a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail installment transaction under this article." *See* O.C.G.A. § 10-1-31(a)(1). Reading these sections *in pari materia* --- which the bankruptcy court determined was proper in light of the ambiguity in section 11-9-

103(a)(2) and the relationship between the two statutes --- the court held that "the Georgia General Assembly intended, with its 1999 amendment to the MVSFA, to permit negative equity in a trade-in vehicle to be added to the cash sales price of a new vehicle without precluding the financing creditor or its assignee from taking a purchase money security interest in the new vehicle." The Debtor was thus found to have a purchase money security interest in the vehicle pursuant to state law, which precluded bifurcation and "cramdown" under section 506. In affirming this decision, the district court held on appeal:

> [T]he price of the collateral included the negative equity. The trade-in of the vehicle was an integral part of the sales transaction. The value of that trade-in along with its accompanying debt affected the ultimate price that was paid for the new pick-up truck. The negative equity is inextricably intertwined with the sales transaction and the financing of the purchase. This close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of the collateral [footnote omitted]. Accordingly, the Court finds that the Creditor has a purchase money security interest for the full amount of its debt. Thus, § 506 shall not apply to modify the amount of the secured obligation.

The Debtor now appeals.

## II. STANDARD OF REVIEW

The factual findings of the bankruptcy court cannot be set aside unless they

11

are clearly erroneous; however, conclusions of law made by either the bankruptcy court or the district court are subject to *de novo* review. *See In re Sublett*, 895 F.2d 1381, 1383 (11th Cir. 1990). In a bankruptcy case, the district court functions as an appellate court, rendering this Court the "'second court of review.'" *Id.* at 1384 (citation omitted).

III. DISCUSSION

As we noted at the outset of this opinion, the issue presented in this case has been confronted by dozens of lower courts. These decisions generally fall into two broad camps. The first camp holds, as the bankruptcy court held here, that the creditor's purchase money security interest encompasses all components of the new vehicle purchase, including financing of negative equity. *See, e.g., Peaslee, supra,* 373 B.R. at 252; *In re Myers,* 2008 WL 2445214 (Bankr. S.D. Ind. June 13, 2008); *In re Ford,* --- B.R. ---, 2008 WL 2095677 (Bankr. D. Kan. May 8, 2008); *In re Austin,* 381 B.R. 892 (Bankr. D. Utah 2008); *In re Dunlap,* 383 B.R. 113 (Bankr. E.D. Wis. 2008); *In re Vinson,* 2008 WL 319678 (Bankr. D.S.C. Jan. 25, 2008); *In re Schwalm,* 380 B.R. 630 (Bankr. M.D. Fla. 2008); *In re Weiser,* 381 B.R. 263 (Bankr. W.D. Mo. 2007); *In re Brei,* 2007 WL 4104884 (Bankr. D. Ariz. Nov. 14, 2007); *In re Burt,* 378 B.R. 352 (Bankr. D. Utah 2007); *In re Bradlee,* 2007 Bankr. LEXIS 3863 (Bankr.W.D. La. Oct. 10, 2007); *In re Watson,* 2007 WL

2873434 (Bankr. E.D. Cal. Sept. 27, 2007); *In re Wall,* 376 B.R. 769 (Bankr. W.D.N.C. 2007); *In re Cohrs,* 373 B.R. 107 (Bankr. E.D. Cal. 2007); *In re Petrocci,* 370 B.R. 489 (Bankr. N.D.N.Y. 2007).

The second camp holds that certain components of the loan, most notably negative equity in a trade-in vehicle, do not constitute a purchase money security interest. *See, e.g., In re Munzbert*, --- B.R. ---, 2008 WL 2332267 (Bankr. D. Vt. June 3, 2008); *In re Callicott*, 386 B.R. 232 (Bankr. E.D. Mo. 2008); *In re Jernigan*, 2008 WL 922346 (Bankr. E.D.N.C. Mar. 31, 2008); *In re Look*, 383 B.R. 210 (Bankr. D. Me. 2008); *In re Wear*, 2008 WL 217172 (Bankr. W.D. Wash. Jan 23, 2008); *In re Johnson*, 380 B.R. 236 (Bankr. D. Or. 2007); *In re Tuck*, 2007 WL 4365456 (Bankr. M.D. Ala. Dec. 10, 2007); *In re Lavigne*, 2007 WL 3469454 (Bankr. E.D. Va. Nov. 14, 2007); *In re Conyers*, 379 B.R. 576 (Bankr. M.D.N.C. 2007); *In re Hayes*, 376 B.R. 655 (Bankr. M.D. Tenn. 2007); *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007); *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007); *In re Hernandez-Simpson*, 369 B.R. 36 (D. Kan. 2007); *In re Bray*, 365 B.R. 850 (Bankr. W.D. Tenn. 2007); *In re Mitchell*, 379 B.R. 131 (Bankr. M.D. Tenn. 2007); *In re Sanders*, 377 B.R. 836 (Bankr. W.D. Tex. 2007); *In re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla. 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Ca. 2007); *In re Vega*, 344 B.R. 616 (Bankr. D. Kan. 2006).

The latter group of cases lead to a further inquiry on how to treat "partial" purchase money securities, which has caused still more divergences in the law. Some courts have adopted the "dual-status rule" (which allows the court to treat the purchase-money portion as purchase-money, while the non-purchase-money portion remains non-purchase-money), *see, e.g., Pajot, supra,* 371 B.R. at 139, whereas other courts have adopted the "transformational rule" (which holds that a security interest that is part purchase-money and part non-purchase-money completely loses its purchase-money character and is entirely "transformed" into a non-purchase-money security interest), *see, e.g., Price, supra,* 363 B.R. at 734; *see also Lavigne, supra,* 2007 WL 3469454, at *9 (noting that courts are "divided" on the issue of whether to apply the dual status or transformational rule and collecting cases on both sides). One court has appropriately described the foregoing as a "maddeningly inconsistent body of decisions." *See In re Westfall,* 376 B.R. 210, 213 (Bankr. N.D. Ohio 2007).

The ultimate issue we must decide is whether the Debtor's negative equity in his trade-in vehicle constitutes purchase money. Our Court has defined what is, and what is not, a purchase money security interest, and we apply that definition here:

> A security interest in collateral is "purchase money" to

14

> the extent that the item secures a debt for the money required to make the purchase. If an item of collateral secures some other type of debt, e.g., antecedent debt, it is not purchase money.

*In re Freeman*, 956 F.2d 252, 254-55 (11th Cir. 1992). So, the question is whether negative equity on a trade-in vehicle is "debt for the money required to make the purchase" of the new vehicle, or whether it is "antecedent debt." It is, as the split in the decided cases indicates, a close call.

Upon consideration, however, we agree with the bankruptcy court that, when looking to Georgia state law, negative equity is more properly regarded as the former and not the latter. When O.C.G.A. §§ 11-9-103 (UCC) and 10-1-31(a)(1) (MVSFA) are read *in pari materia* (which we believe is appropriate for all the reasons stated by the bankruptcy court), it is the only reasonable conclusion to reach. Because this issue was properly considered and analyzed at length by the bankruptcy court, and by certain of the courts in the "first camp" above, we see no reason to duplicate the analysis as the path is by now well-worn.[3] We do add,

---

[3] Several of the decided cases have relied on the same *in pari materia* argument that the bankruptcy court employed here to buttress its conclusion that a purchase money security interest includes negative equity. *See, e.g., Peaslee, supra,* 373 B.R. at 252; *Schwalm, supra,* 380 B.R. at 630; *Petrocci, supra,* 370 B.R. at 489; *Cohrs, supra,* 373 B.R. at 107; *Bradlee, supra,* 2007 Bankr. LEXIS 3863. These courts relied on --- or stated in dicta that it would be appropriate to rely on --- the definition of "cash sales price" or "cash price" in New York's, Florida's, California's, and Louisiana's similar statutes as additional statutory support to conclude that the unpaid balance on a trade-in vehicle can and should be considered as part of a purchase price on the new vehicle and, therefore, entitled to a purchase money security interest because those

15

however, that our decision finds support in the relevant UCC Official Comment and is consistent with legislative intent.

Section 9-103 of the UCC, adopted by O.C.G.A. § 11-9-103, provides that "[a] security interest in goods is a purchase-money security interest . . . to the extent that the goods are purchase-money collateral with respect to that security interest[.]" It then defines "purchase-money collateral" as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." The term "purchase-money obligation" is defined, in turn, as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." In sum, therefore, the focus of the definition of a purchase money security interest under the UCC is on the "purchase-money obligation" that is secured by the collateral, and this definition contains two prongs: (i) the price of the collateral; and (ii) value given to enable the debtor to buy the collateral. Official Comment 3 to the UCC explains:

> [T]he definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage

---

statutes included negative equity in their definitions of "cash price."

16

> in transit, demurrage, administrative charges, expenses
> of collection and enforcement, attorney's fees, *and other
> similar obligations*.[4]

U.C.C. § 9-103, Official Comment 3 (emphasis added). Although the Debtor

argues that negative equity is "not equivalent" to the various expenses listed in

Comment 3, as the emphasized language indicates, the list is not exhaustive. The

expenses identified in Comment 3 are merely examples of additional components

of the "price" of the collateral or of "value given" to the debtor, and we see no

persuasive reason why traditional transaction costs *and* the refinancing of

reasonable, bona fide negative equity in connection with the purchase of the new

vehicle should not qualify as "expenses" within the meaning of the comment.  To

be sure, as one court has rightly observed, the fact that "attorney's fees" are listed

in Comment 3 "belies the notion that 'price' or 'value' is narrowly viewed as only

those [traditional] expenses that *must* be paid to drive the car off the lot. Comment

3 expressly 'includes' the broad phrase 'obligations for expenses incurred in

connection with acquiring rights in the collateral'" and, consequently, "the

---

[4] The former Fifth Circuit recognized that UCC Official Comments are "'by far the most useful aids to interpretation and construction.'" *Weathersby v. Gore*, 556 F.2d 1247, 1256 (5th Cir. 1977) (citation omitted) (binding under *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*)); *accord Westfall, supra,* 376 B.R. at 217-19 (setting forth the history behind UCC Official Comments and observing that although the comments are not "'given binding effect,'" they do "'occupy an unusual position as aids to statutory interpretation'" and should be regarded as "'an indispensable part of the UCC framework'") (citations omitted).

17

definitions of 'price' and 'value' should be interpreted broadly." *Myers, supra,* 2008 WL 2445214, at *4 (emphasis in original).

Comment 3 further states that a purchase money security interest "requires a close nexus between the acquisition of collateral and the secured obligation." We believe there is such a "close nexus" between the negative equity in the Debtor's trade-in vehicle and the purchase of his new vehicle. The financing was part of the same transaction and may be properly regarded as a "package deal." Payment of the trade-in debt was tantamount to a prerequisite to consummating the sales transaction, and utilizing the negative equity financing was a necessary means to accomplish the purchase of the new vehicle. As the district court held in affirming the bankruptcy court, the negative equity was an "integral part of," and "inextricably intertwined with," the sales transaction. To hold otherwise would not be a fair reading of the UCC.

Nor would it comport with what Congress intended in enacting BAPCPA. In interpreting the hanging paragraph, like any statute, we are guided by the general principle of statutory construction that a statute should be interpreted and applied with an understanding and appreciation of the "purpose it was intended to serve." *United States v. Ballinger*, 395 F.3d 1218, 1237 (11th Cir. 2005) (*en banc*). Because the legislature is presumed to act with sensible and reasonable purpose, a

statute should, if at all possible, be read "'so as to avoid an unjust or absurd conclusion.'" *See id.* (*quoting In re Chapman*, 166 U.S. 661, 667, 17 S. Ct. 677, 41 L. Ed. 1154 (1897)). Therefore, in applying the hanging paragraph to the facts of this case, we must keep before us the underlying purpose of, and legislative intent behind, the statute. Here, the hanging paragraph ultimately seeks to require a debtor electing to retain a "910 vehicle" to pay the creditor the full amount of the claim and not (as under pre-BAPCPA law) an amount equal to the present value of the car. *See In re Trejos*, 374 B.R. 210, 220 (9th Cir. BAP 2007) ("[T]he purpose underlying the 'Hanging Paragraph'" is to ensure that debtors "'repay in a Chapter 13 the amount they actually agreed to pay for a motor vehicle purchased within 910 days of bankruptcy, instead of the true value of the collateral.'") (citation omitted). The practice in automobile financing over the years has been to extend the repayment period over longer time frames: from three years in the past up to as much as five years, or more, now. One result of such an extended payment period is that having negative equity in a vehicle is common. The hanging paragraph plainly addresses the negative equity that the Debtor may have in a vehicle at the time of filing, and it seems that the intended purpose was, at least in part, to deal with the negative equity practice.

Rolling a trade-in's negative equity into the purchase price of a new vehicle

19

was a common occurrence at the time BAPCPA was enacted in 2005, and it still is to this day. According to estimates cited by the Creditor, and relied on by several courts, negative equity trade-in transactions occurred in from 29 to 38 percent of all new vehicle purchases in past years, and that figure appears to only be on the rise. *See, e.g., Pajot, supra,* 371 B.R. at 153 n.17 (citing Brian J. O'Connor, *At Trade-In, Many Car Buyers are Left with the Upside-Down Blues,* Detroit News, June 12, 2006 ("Last month nearly 29 percent of U.S. car buyers found themselves 'upside down.'"); and FDIC Supervisory Insights, *The Changing Landscape of Indirect Automobile Lending*, June 23, 2005 ("J.D. Power and Associates estimates that approximately 38 percent of new car buyers have negative equity at trade-in, compared to 25 percent two years ago.")). If Congress did not intend for the hanging paragraph to apply to a trade-in's negative equity, as the Debtor ultimately contends, it would have the effect of excluding a substantial number of lawful auto finance transactions that were industry practice when BAPCPA was enacted (a practice that Congress is presumed to have known about). This would be an absurd result given that it is recognized that the "'architects [of the hanging paragraph] intended only good things for car lenders and other lienholders.'" *See Long*, *supra,* 519 F.3d at 294 (citations omitted). It would be particularly absurd because a strong argument can be made that "*the primary purpose* of the hanging

paragraph of Code § 1325(a)(9) is, in fact, precisely to take the unsecured negative equity debt which any Chapter 13 debtor has when his or her less than nine hundred and ten day-old vehicle is not worth the outstanding loan balance, and, by refusing it the Code § 506 treatment, to transform it into secured debt not supported by collateral value, and then require it to be paid in full to the detriment of other unsecured creditors." *Petrocci, supra,* 370 B.R. at 502 (emphasis added) (citation and quotation marks omitted); *accord Dunlap, supra,* 383 B.R. at 118 ("Nothing in BAPCPA declares that negative equity financing bars a secured lender from protection under the hanging paragraph. To the contrary, one of BAPCPA's goals was to afford additional protection for secured creditors and, primarily, for automobile lenders."). A contrary interpretation is not supported by the text of the hanging paragraph or its legislative history.[5]

## IV. CONCLUSION

For the foregoing reasons, the order of the district court, in turn affirming the bankruptcy court, is **AFFIRMED.**

---

[5] We again emphasize that the facts of this case involve reasonable, bona fide negative equity in the trade-in vehicle. Because we have dealt here only with a legitimate purchase transaction, we leave for another day what the result might be if there is evidence of subterfuge relating to an unrelated antecedent debt.