In re Raymond Howard **RILEY** and Wilma Dean Riley, Debtors.

No. 09–41715.

United States Bankruptcy Court, N.D. Ohio.

Feb. 3, 2010.

Robert A. Ciotola, Canfield, OH, for Debtors.

## MEMORANDUM OPINION REGARD-ING DEBTORS' OBJECTION TO CLAIM # 5 FILED BY TRIAD FINANCIAL CORPORATION

KAY WOODS, Bankruptcy Judge.

This cause is before the Court on Objection to Claim of Triad Financial Corporation, Claim # 5, Filed 5/27/2009 ("Objection to Claim") (Doc. # 23) filed by Debtors Raymond Howard Riley and Wilma Dean Riley ("Debtors") on November 11, 2009. Triad Financial Corporation ("Triad") did not file a response to the Objection to Claim. For the reasons set forth below, Debtors' Objection to Claim will be denied, in part, and sustained, in part.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference (General Order No. 84) entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408, and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### I. BACKGROUND

Debtors filed a voluntary petition ("Petition") pursuant to chapter 13 of the Bankruptcy Code on May 12, 2009 ("Petition Date"). On that same date, Debtors filed Original Chapter 13 Plan ("Plan") (Doc.

#2). The Plan does not include any "Secured Claims for Which § 506 Valuation is Not Permitted." (Plan, art. 2 D.) However, the Plan does include a secured claim for "Triad Financial" in the amount of $18,500.00,[1] plus interest at the rate of 4.25%. (Plan, art. 2 F.) The Plan also includes a related general unsecured claim for "Triad Financial" in the amount of $5,500.00 that "shall be paid a dividend of at least 10%." (Plan, arts. 2 A, 2 F.)

The first date set for the meeting of creditors under § 341(a) of the Bankruptcy Code was June 3, 2009. On May 27, 2009, Triad timely filed Proof of Claim No. 5–1 ("Claim 5")[2] in the amount of $23,766.75, plus interest at the contract interest rate of 7.59%. (Claim 5 at 1.) Triad asserts that its claim is fully secured by a motor vehicle—"07 Dodge Grand Carava [sic]" ("Dodge Caravan")—and that there is "no cramdown per statute" of its claim. *Id.*

The Court confirmed the Plan, without objection, pursuant to Confirmation Order entered July 23, 2009 (Doc. #18). The Confirmation Order states: "Trustee shall pay claims as filed, absent an objection by Debtor or other party in interest. A creditor may file a proof of claim at any time prior to expiration of the bar date for filing proofs of claim in an amount other than as

provided in the Plan." (Confirmation Order, ¶ 13.)

In their Objection to Claim, Debtors contend that "the debt to Triad Financial Corporation is partially protected by the 'hanging paragraph' of 11 USC 506[sic].[3] There was a trade-in with a shortfall of $8,731.00 which was forwarded [sic] into the loan[.]" (Obj. to Claim at 1.) Debtors ask the Court to reduce Triad's secured claim to $15,035.75, which they allege was the "actual purchase price" for the Dodge Caravan. *Id.* Although Debtors fail to articulate the basis for their objection, they appear to contend that: (i) Claim 5 includes negative equity financing (which Debtors call a "shortfall" in the value of the trade-in) in the amount of $8,731.00;[4] (ii) the hanging paragraph following 11 U.S.C. § 1325(a) does not apply to negative equity financing; and (iii) the negative equity financing should be treated as an unsecured claim pursuant to 11 U.S.C. § 506. Debtors also assert that the contract interest rate of 7.59% is "excessive and should be 4.25% [prime rate 3.25% plus 1% risk factor]." *Id.* Accordingly, Debtors' Objection to Claim seeks bifurcation of Claim 5 into: (i) a secured claim in the amount of $15,035.75, plus interest at the rate of 4.25%; and (ii) an unsecured claim in the amount of $8,731.00. *Id.*

---

1. Debtors' Plan provides for a secured claim in favor of Triad that is approximately $3,500.00 more than the amount to which Debtors seek to reduce Triad's secured claim in their Objection to Claim.

2. Rule 3002(c) of the Federal Rules of Bankruptcy Procedure states: "In a … chapter 13 individual's debt adjustment case, a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under § 341(a) of the Code…." FED. R. BANKR.P. 3002 (West 2009).

3. While Debtors cite to the " 'hanging paragraph' of 11 USC 506," the Court assumes

that Debtors meant the paragraph following 11 U.S.C. § 1325(a), which is commonly known as the hanging paragraph and which makes reference to § 506.

4. Although there is no evidence that Claim 5 includes negative equity financing, this Court adopts Debtors' statement in the Objection to Claim that there was a "shortfall" of $8,731.00 when Debtors traded in their former vehicle for the Dodge Caravan, which is the secured collateral for Claim 5. (Obj. to Claim at 1.) As a consequence, such shortfall of $8,731.00 constitutes negative equity.

## II. BIFURCATION UNDER 11 U.S.C. § 506

The Bankruptcy Code mandates that, in certain instances, secured claims be bifurcated into secured and unsecured portions. Section 506(a)(1) of the Bankruptcy Code states, in pertinent part:

An allowed claim of a creditor secured by a property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506 (West 2009). Thus, § 506(a)(1) provides that, when the value of the collateral securing a claim is less than the claim amount, the claim shall be bifurcated into: (i) a secured claim equal to the value of the creditor's interest in the collateral;[5] and (ii) an unsecured claim equal to the amount of the claim less the value of the creditor's interest in the collateral. *Id.*

Except as noted below, a debtor can confirm or "cram down" a chapter 13 plan, over the objection of a secured creditor, so long as: (i) the creditor retains the lien securing its claim; and (ii) the plan provides for payments to the creditor, over the life of the plan, not less than the present value of the collateral. 11 U.S.C. § 1325(a)(5)(B) (West 2009); *Assocs. Commercial. Corp. v. Rash,* 520 U.S. 953, 956–

57, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Pursuant to § 506(a), the remainder of the secured creditor's claim—the amount of the claim less the value of the creditor's interest in the collateral—is an unsecured claim. 11 U.S.C. § 506.

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), however, created an exception to a debtor's ability to bifurcate a secured claim. BAPCPA includes a paragraph at the end of § 1325(a) that is not given an alphabetic or numeric designation and is commonly known as the "hanging paragraph." The hanging paragraph states, in pertinent part:

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle ... acquired for the personal use of the debtor....

11 U.S.C. § 1325. As a consequence, the hanging paragraph prevents bifurcation of a secured claim if: (i) the debt that is the subject of the claim was incurred within the 910–day period preceding the filing of the bankruptcy petition; (ii) the collateral for the debt is a motor vehicle; (iii) the creditor has a purchase money security interest ("PMSI") in the collateral; and

---

5. This statement assumes the estate's interest in the property is the same as the debtor's interest in the property. Section 506 refers to the "creditor's interest in the estate's interest in such property," rather than the debtor's interest, because the commencement of a bankruptcy case creates an estate. *See* 11 U.S.C. § 541(a) (West 2009). In most instances the debtor's interest and the estate's interest will be identical. However, "[i]n some instances, the debtor may not be the sole owner of the collateral, or the nature of the debtor's interest may be something other than an ownership interest, such as a leasehold interest." *General Motors Acceptance Corp. v. Valenti (In re Valenti),* 105 F.3d 55, 60 (2d Cir.1997). In the instant case, Debtors are the sole owners of the Dodge Caravan. (*See* Debtors' Sched. B, ¶ 25.) Accordingly, the estate's interest in the Dodge Caravan is the same as the Debtors' interest therein.

(iv) the motor vehicle was acquired for the debtor's personal use. *Id.* If the requirements of the hanging paragraph are satisfied, "the allowed secured claim is fixed at the amount of the creditor's claim without resort to the 'cramdown' provision mandated by section 506(a)." *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295, 1298 (11th Cir.2008).

In the instant case, the parties dispute the extent to which Claim 5 is subject to the hanging paragraph. Triad asserts that Claim 5 may not be crammed down pursuant to the hanging paragraph and, thus, is fully secured. (Claim 5 at 1.) Debtors assert that: (i) Triad is only "partially protected" by the hanging paragraph; and (ii) only $15,035.75 of Claim 5 constitutes a secured claim. (Obj. to Claim at 1.) Debtors implicitly concede that Triad has a PMSI in a motor vehicle acquired for Debtors' personal use and that the PMSI secures debt incurred within the 910–day period preceding the Petition Date.[6] *See id.* Thus, there does not appear to be any dispute that: (i) the entire debt included in Claim 5 was incurred within the 910–day period preceding the Petition Date; and (ii) the collateral for the debt is a motor vehicle acquired for Debtors' personal use. Debtors dispute only the amount of the PMSI and assert that such security interest is limited to $15,035.75, with the remainder of the debt to be deemed an unsecured claim. *Id.*

The Court must determine whether the hanging paragraph precludes bifurcation of that portion of a secured claim representing the financing of negative equity. "[I]n a car transaction, [negative equity]

refers to the difference between the value of a vehicle that the buyer trades in and the amount of the buyer's preexisting debt on that trade-in." *Wells Fargo Fin. Acceptance v. Price (In re Price)*, 562 F.3d 618, 621 (4th Cir.2009). Debtors fail to articulate any reason to exclude the negative equity financing portion of Claim 5 from the protection of the hanging paragraph. The Court construes Debtors' argument to be that the negative equity financing portion of Claim 5 is not subject to a PMSI and, thus, this amount can be bifurcated from the secured portion of the claim. As a consequence, the question for resolution is whether Triad has a PMSI in the portion of Claim 5 that represents the negative equity financing related to Debtors' trade-in vehicle.

■ PMSI is not defined in the Bankruptcy Code and is used in only one place other than the hanging paragraph—*i.e.,* 11 U.S.C. § 522(f). However, PMSI is defined in Ohio Revised Code § 1309.103. Because the Bankruptcy Code does not define PMSI, application of the state-law definition of PMSI is appropriate. To date, each of the six circuit courts to consider this issue has used state law to define PMSI. *See Reiber v. GMAC, LLC (In re Peaslee)*, 585 F.3d 53 (2d Cir.2009); *Wells Fargo Fin. Acceptance v. Price (In re Price)*, 562 F.3d 618 (4th Cir.2009); *Ford Motor Credit Co. LLC v. Dale (In re Dale)*, 582 F.3d 568 (5th Cir.2009); *Ford Motor Credit Co. v. Mierkowski (In re Mierkowski)*, 580 F.3d 740 (8th Cir.2009); *Ford v. Ford Motor Credit Corp. (In re Ford)*, 574 F.3d 1279 (10th Cir.2009); and

---

**6.** Moreover, Debtors' Petition provides that the "[d]ebts are primarily consumer debts defined in 11 U.S.C. § 101(8) as 'incurred by an individual primarily for a personal, family, or household purpose.'" (Pet. at 1.) Debtors' Schedule B—Personal Property lists "2007 Dodge Grand Caravan" as jointly owned personal property. (Debtors' Sched. B, ¶ 25.) Debtors' Schedule D—Creditors Holding Secured Claims lists "Triad Financial" as holding a secured claim with the description and value of the collateral listed as "2007 Dodge Grand Caravan $18,500.00." (Debtors' Sched. D at 1.)

*Graupner v. Nuvell Credit Corp. (In re Graupner),* 537 F.3d 1295 (11th Cir.2008).

Ohio Revised Code § 1309.103, which tracks Uniform Commercial Code ("UCC") § 9–103, states:

(A) As used in this section:

(1) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and

(2) "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(B) A security interest in goods is a purchase-money security interest:

(1) To the extent that the goods are purchase-money collateral with respect to that security interest;

\* \* \*

Ohio Rev.Code Ann. § 1309.103 (Bender 2010).

■ Whether an obligation is a "purchase-money obligation" secured by a PMSI "depends upon whether the underlying obligation was incurred to pay all or part of the price of the collateral or covers value given to enable the debtor to acquire rights in or the use of the collateral." *Ford v. Ford Motor Credit Corp. (In re Ford),* 574 F.3d 1279, 1284 (10th Cir.2009) (citation and quotation marks omitted). Official Comment 3 to Ohio Revised Code § 1309.103 ("Comment 3") states:

[T]he "price" of collateral or the "value given to enable" *includes* obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

\* \* \*

Ohio Rev.Code Ann. § 1309.103, cmt. 3 (Bender 2010) (emphasis added). "[T]he fact that 'attorney's fees' are listed in Comment 3 'belies the notion that price or value is narrowly viewed as only those traditional expenses that *must* be paid to drive the car off the lot.'" *In re Graupner,* 537 F.3d at 1302 (quoting *In re Myers,* 393 B.R. 616, 620 (Bankr.S.D.Ind. 2008)) (emphasis in original). By including "obligations for expenses incurred in connection with acquiring rights in the collateral" in the definitions of "price" and "value," Comment 3 suggests that these terms be interpreted broadly. *Id.*

■ Neither the Sixth Circuit Court of Appeals nor the Ohio Supreme Court has determined whether negative equity financing constitutes a purchase-money obligation. However, analyzing facts similar to those before this Court, the Fourth Circuit Court of Appeals held: "Under a natural reading of state law, the negative equity financing here created a purchase-money obligation because that financing enabled the [debtors] to acquire rights in their new car[ ]" and "was integral to the whole transaction in which the new vehicle was purchased." *Wells Fargo Fin. Acceptance v. Price (In re Price),* 562 F.3d 618, 625 (4th Cir.2009). Because car dealers are generally unwilling to accept a trade-in vehicle with an outstanding lien, extinguishing the negative equity in a trade-in vehicle is necessary in order to use that trade-in vehicle as part of the purchase price for a new vehicle. *Id.*

In the instant case, based on Debtors' assertion that they owed $8,731.00 on their trade-in vehicle at the time they financed the purchase of the Dodge Caravan, such negative equity financing constituted value for such purchase. Because "negative eq-

uity financing enabled the transaction in which the new car was acquired, then, in reality, the negative equity financing also enabled the acquisition of rights in the new car." *Id.* As a result, this Court finds that the portion of Claim 5 representing negative equity financing—*i.e.*, $8,731.00—is a purchase-money obligation, as defined in Ohio Revised Code § 1309.103(A)(2). This conclusion is consistent with the decision of at least one other bankruptcy court in Ohio. *See In re Dawn S.*, 2008 Bankr.LEXIS 2550 (Bankr.S.D.Ohio 2008) (holding that negative equity financing qualifies as a purchase-money obligation under Ohio Revised Code § 1309.103(A)(2).).

Because Debtors' Dodge Caravan serves as collateral for a purchase-money obligation, the Dodge Caravan is "purchase-money collateral." OHIO REV.CODE ANN. § 1309.103(A)(1) (Bender 2010). Furthermore, because the Dodge Caravan serves as purchase-money collateral for Triad's security interest, such security interest constitutes a PMSI, as defined in Ohio Revised Code § 1309.103(B). *See In re Dawn S.*, 2008 Bankr.LEXIS 2250.

Finally, every circuit court to have considered this issue—the Second, Fourth, Fifth, Eighth, Tenth, and Eleventh Circuit Courts of Appeals—has concluded that the term PMSI, as defined in UCC § 9–103,[7] includes negative equity financing incorporated in the purchase price for a motor vehicle. *See Reiber v. GMAC, LLC (In re Peaslee)*, 585 F.3d 53 (2d Cir.2009); *Wells Fargo Fin. Acceptance v. Price (In re Price)*, 562 F.3d 618 (4th Cir.2009); *Ford Motor Credit Co. LLC v. Dale (In re Dale)*, 582 F.3d 568 (5th Cir.2009); *Ford Motor Credit Co. v. Mierkowski (In re Mierkowski)*, 580 F.3d 740 (8th Cir.2009); *Ford v. Ford Motor Credit Corp. (In re Ford)*, 574 F.3d 1279 (10th Cir.2009); and *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295 (11th Cir.2008).

For the reasons set forth above, this Court concludes that Triad's PMSI encompasses the negative equity financing incorporated in the purchase price for Debtors' Dodge Caravan. Therefore, the entirety of Claim 5 is protected by the hanging paragraph and is not subject to bifurcation. Accordingly, Claim 5 is fully secured in the amount of $23,766.75.

### III. PRESENT VALUE UNDER 11 U.S.C. § 1325

Having determined that Debtors cannot bifurcate Claim 5, the Court must next determine the value of Claim 5 as of the effective date of the plan, or, to put it another way, the present value of Triad's claim. *See* 11 U.S.C. § 1325 (West 2009). In *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004),[8] the Supreme Court rejected the "coerced loan, presumptive contract rate,[9] and the cost of funds approaches[ ]" to determine the present value of a secured claim. *Id.* at 477, 124 S.Ct. 1951. Instead, the Supreme Court opted for the "formula approach," which adjusts the national prime

---

7. UCC § 9–103 is applicable in the instant case under Ohio Revised Code § 1309.103.

8. The *Till* holding was a plurality opinion written by Justice Stevens and joined by Justices Souter, Ginsburg, and Breyer. Justice Thomas filed an opinion concurring in the judgment. *Id.*

9. The Supreme Court rejected the use of the contract rate of interest to calculate the pres-

ent value of a claim. *Id.* at 476, 124 S.Ct. 1951. (" § 1325(a)(5)(B) ... does not require that the terms of the cram down loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment.").

rate upward to reflect the risk inherent in loaning money to a specific debtor:

Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Id.* at 478–79, 124 S.Ct. 1951. Despite adopting the formula approach, however, the Supreme Court expressly declined to decide the proper scale for risk adjustment. *Id.* at 480, 124 S.Ct. 1951.

In the *Till* case, which dealt with confirmation of a chapter 13 plan that crammed down a motor vehicle, the parties agreed that: (i) the debtors owed $4,894.89 on the vehicle; and (ii) the vehicle had a value of $4,000.00 when debtors filed their bankruptcy petition on October 25, 1999. The debtors' proposed plan provided for payment of a secured claim of $4,000.00, plus interest at the rate of 9.5% per year. The creditor objected, insisting that the contract rate of 21% be utilized.[10] The Supreme Court noted that the *Till* debtors utilized a national prime rate of "approximately 8%," plus a risk factor of 1.5%, to obtain the proposed interest rate of 9.5% in their plan.[11] *Id.*

In *DaimlerChrysler Servs. North America LLC v. Taranto (In re Taranto)*, 365 B.R. 85 (6th Cir. BAP 2007), the Bankruptcy Appellate Panel for the Sixth Circuit ("Sixth Circuit BAP"), interpreting the hanging paragraph, held that the *Till* analysis governs determination of the interest rate necessary to ensure present value under § 1325(a)(5)(B)(ii). *Id.* at 90. In the *Taranto* case, the debtors proposed to pay a creditor's claim, which was secured by a vehicle, at the contract rate of 0% interest and to accelerate payments to the creditor—*i.e.,* pay off the debt in a shorter period than the contract required. The *Taranto* debtors argued that the *Till* prime-plus interest rate would result in a windfall to the creditor. The Sixth Circuit BAP held that the contract rate of interest—whether 0% or 25%—need not be considered. *Id.* The Sixth Circuit BAP concluded: "Because the Debtors' plan

---

**10.** The Supreme Court noted that, "If the [bankruptcy] court determines that the likelihood of default is so high as to necessitate an 'eye-popping' interest rate, the plan probably should not be confirmed." *Id.* at 480–81, 124 S.Ct. 1951 (citation omitted). In the instant case, the contract interest rate of 7.59% is not "eye-popping," although the rate itself is "irrelevant" under the *Till* analysis. *Id.* at 478, 124 S.Ct. 1951. In contrast, in a chapter 11 case, the Sixth Circuit Court of Appeals found that an interest rate of 12.16%, when the prime rate in effect on the date of confirmation was 4.25%, "appear[ed] to fall under the 'eye-popping' category described unfavorably by *Till.*" *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re American HomePatient, Inc.),* 420 F.3d 559, 569 (6th Cir. 2005).

**11.** According to www.primeratehi story. info, the prime rate as of July 1, 1999, was 8.00%; as of August 25, 1999, 8.25%; and as of November 17, 1999, 8.50%. Thus, it appears that the prime rate utilized by the *Till* debtors was slightly lower than the rate applicable on the date they filed their petition. On the date the Supreme Court rendered its decision, the prime rate had fallen to approximately 4%.

proposes to pay the [creditor's] secured claim by making periodic installment payments, the *Till* analysis governs and mandates that the [creditor] receive the present value of its secured claim." *Id.* at 91.

■ Based upon Justice Stevens's plurality opinion in *Till* and its interpretation by the Sixth Circuit BAP, this Court is compelled to calculate the present value of Claim 5 using the formula approach. Debtors contend that the contract rate of interest in the present case is "excessive and should be 4.25% [prime rate 3.25% plus 1% risk factor]." (Obj. to Claim at 1.) *Till* requires this Court to disregard the 7.59% rate of interest in the contract between Triad and Debtors because the terms of the original contract between the parties are irrelevant. *Till*, 541 U.S. at 478, 124 S.Ct. 1951 ("Although it rightly disregards the now-irrelevant terms of the parties' original contract...."). This Court acknowledges that, as of the Petition Date, the published national prime rate of interest was 3.25%. This Court is also aware that the *Till* plurality opinion places the burden on the creditor rather than the debtor to present evidence supporting the appropriate interest rate. "Thus, the formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate." *Id.* at 484–85, 124 S.Ct. 1951. Nevertheless, Debtors provide no support or reason whatsoever for their use of 1% as an appropriate risk factor in conjunction with the *Till* analysis. (*See* Obj. to Claim at 1.)

From prior court hearings, this Court is aware that Counsel for Debtors contends that *Till* requires use of a 1% risk factor. This position, however, is not supported by the *Till* decision, which expressly declined to decide the proper scale for risk adjustment. *Till*, 541 U.S. at 480, 124 S.Ct. 1951 ("We do not decide the proper scale for the risk adjustment, as the issue is not before us."). Under these circumstances, this Court has no basis to defer to Debtors' choice of a 1% risk factor. The Supreme Court did not endorse a range for the risk factor; it merely noted that "other courts have generally approved adjustments of 1% to 3%, see *In re Valenti*, 105 F.3d 55, 64(CA2) (collecting cases), abrogated on other grounds...." *Id.* The Second Circuit Court of Appeals in the *Valenti* case also did not determine the appropriate rate of interest, but held that "a range of one to three percent is reasonable[.]" *General Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55, 64 (2d Cir.1997).

■ In the present case, Debtors contend that approximately one-third of the debt to Triad constitutes negative equity financing. (*See* Obj. to Claim at 1.) Currently, the average interest rate for an adjustable rate one-year mortgage is 4.32%—which approximates, but which exceeds, the rate proposed by Debtors.[12] The collateral for a one-year adjustable rate mortgage is residential real estate, which may or may not increase in value; however, it is nearly certain that a vehicle will depreciate in value over time. In addition, because a one-year adjustable rate mortgage is, by definition, adjustable after one year, it provides less risk to a creditor than Debtors' proposed fixed rate of 4.25% over the sixty-month term of the plan. *See In re Valenti*, 105 F.3d at 64 ("[T]he market rate of interest under § 1325(a)(5)(B)(ii) should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the

12. Source: www.bankrate.com (last visited January 22, 2010).

repayment schedule under the debtor's reorganization plan.").

In determining the appropriate "prime-plus" interest rate, this Court has considered the following factors: (i) the current low national prime rate of interest; (ii) Debtors' failure to articulate any reason for using a 1% risk factor; (iii) the large amount of negative equity financing in Claim 5; and (iv) the sixty-month term of Debtors' plan.[13] Based on all of these factors, the Court determines that an appropriate risk factor in the instant case is 2%. Moreover, this risk factor is consistent with *In re Soards,* 344 B.R. 829 (Bankr. W.D.Ky.2006), which held: "In the absence of evidence of the risks associated with a default, the Court determines that an additional two percentage points to the prime rate is the appropriate rate to be applied on [the creditor's] claims in these cases." *Id.* at 832. Accordingly, this Court finds that the appropriate rate of interest on Claim 5 is 5.25%, which is based on a 3.25% national prime rate of interest, plus a risk factor of 2%.

## IV. CONCLUSION

Pursuant to the hanging paragraph of 11 U.S.C. § 1325(a), Claim 5 cannot be bifurcated, because: (i) the debt that is the subject of Claim 5 was incurred within the 910–day period preceding the Petition Date; (ii) the collateral for the debt is a motor vehicle; (iii) Triad has a PMSI in the collateral; and (iv) the motor vehicle was acquired for Debtors' personal use. The negative equity financing is included in Triad's PMSI and, thus, is covered by the hanging paragraph. As a result, the Objection to Claim is denied to the extent it seeks to bifurcate Claim 5. Claim 5 will be allowed as fully secured in the amount of $23,766.75.

Section 1325(a) (5)(B)(ii) mandates that Triad receive the present value of its claim as of the effective date of the plan. The Supreme Court's decision in *Till* requires this Court to use the formula approach—based on the national prime rate of interest, plus a risk factor—to determine the present value of Triad's claim. As of the Petition Date, the national prime rate of interest was 3.25%. The Court finds no justification for Debtors' proposed risk factor of 1%, but determines that a risk factor of 2% is appropriate under the circumstances. Based upon a risk factor of 2%, the appropriate rate of interest to determine the present value of Claim 5 is 5.25%. Accordingly, Claim 5 is fully secured in the amount of $23,766.75, plus interest at the rate of 5.25%.

An appropriate order will follow.

**IT IS SO ORDERED.**

**ORDER DENYING, IN PART, AND SUSTAINING, IN PART, DEBTORS' OBJECTION TO CLAIM # 5**

This Cause is before the Court on Objection to Claim of Triad Financial Corporation, Claim # 5, Filed 5/27/2009 ("Objection to Claim") (Doc. # 23) filed by Debtors Raymond Howard Riley and Wilma Dean Riley ("Debtors") on November 11, 2009.

For the reasons set forth in this Court's Memorandum Opinion Regarding Debtors' Objection to Claim # 5 Filed by Triad Financial Corporation entered on this date, this Court hereby: (i) denies Debtors' Objection to Claim to the extent it seeks to bifurcate Claim No. 5–1 ("Claim 5") filed by Triad Financial Corporation; (ii) finds that a prime-plus risk factor of

---

**13.** Although the prime rate has remained unchanged at 3.25% since December 2008, there is no reason for this Court to find that the prime rate will stay in this low range for the next five years.

2% is appropriate under the circumstances; and (iii) holds that Claim 5 is fully secured in the amount of $23,766.75, plus interest at the rate of 5.25%.

**IT IS SO ORDERED.**